**CHARLES A. FOX, Inc., v. UNITED STATES.**

District Court, S. D. New York.   September 9, 1927.

**Shipping ⬤⟞54(2)—Charterer held liable for injury to scow from pounding against side of moored ship in gale.**

Charterer of scow, to be returned in good condition, which permitted her to remain moored alongside a steamship in a slip in a very exposed position during an unusually severe northwest gale, though there was ample time to move her after warning was given by the Weather Bureau, *held* liable for her injury by pounding against the side of the ship.

At Law. Action by Charles A. Fox, Inc., against the United States. Judgment for plaintiff.

This suit was brought under the Act of March 3, 1887 (24 Stat. 505), known as the Tucker Act, to recover damages from the United States for the alleged breach of a

contract between the parties for the charter of the plaintiff's scow, the V. H. Muller.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of New York City, of counsel), for plaintiff.

Charles H. Tuttle, U. S. Atty., of New York City (John M. Ryan, Asst. U. S. Atty., of New York City, of counsel), for the United States.

THACHER, District Judge. On March 4, 1919, the plaintiff chartered to the defendant its scow, the V. H. Muller, at a charter rate of $12 per day, and it was agreed between the parties that the charter should continue until the scow was returned to the charterer in the same condition as received, "except ordinary wear and tear, the act of God, or by any person or agency for whose acts or negligence the United States is not responsible." The plaintiff furnished with its scow a scow captain, for whose services it paid. The scow was returned in a seriously damaged condition. This damage occurred under the following circumstances:

On the morning of March 27, 1919, the scow was moored alongside the steamship Corozal, lying at the south side of Pier 3, Bush Terminal Docks, Brooklyn. At 9:30 a. m. on that day a northwest storm warning was hoisted and distributed to the press, and telephoned to persons on the storm warning list by the Weather Bureau, as follows:

"Hoist northwest storm warning at 9:30 a. m. Jacksonville to Nantucket. Storm over North Carolina, increasing in intensity and moving northeasterly. Strong southerly winds will shift to northwest to-night and increase to gale force, with rain and considerably colder weather."

The slip between Piers 2 and 3 at Bush Terminal, where the scow was berthed, was notoriously dangerous under northwest storm conditions. During the day on March 27th the wind was from the southeast, blowing with increasing velocity, but during that day it was quite possible to move the scow to a safe berth. During the night of the 27th the wind changed to the northwest, and continued from that quarter with increasing velocity during the 28th and the 29th. From noon of the 28th to midnight on the 29th the average hourly velocity was 62.2 miles, 2 miles higher than any daily record theretofore recorded at this port. The maximum velocity reached during this storm was 94 miles per hour.

At about 2 p. m. on Friday, March 28, 1919, the captain in charge of the scow Muller left his boat and went home sick, requesting the captain of a scow moored nearby to look after the Muller. At midnight on the 28th one of the officers of the Corozal, alongside of which the scow Muller was moored, observed when he came on watch that the Muller was pounding very hard against the ship's side. He estimated that the waves running in the slip at that time were from 5 to 6 feet high, and that the velocity of the wind was about 70 to 80 miles an hour. At least one line had broken, and the scow was held by a single line running to the bow of the ship; the ship lying bow out. This line held during the officer's watch, from midnight until 6 a. m. on the 29th. Shortly thereafter the scow turned turtle, but remained in her position alongside the steamer. When taken to dry dock it was found that her entire side was smashed in. From the fact that the scow did not drift away from the steamer after she capsized, I infer that the line to the steamer's bow did not part.

The conditions in the slip after the departure of the scow captain were such that, had he remained on his boat, it would have been quite impossible for him to have prevented the damage which occurred. Any attempt to have moved the scow away from the steamer would have been futile and reckless, risking greater injury to the scow and to other vessels in the slip. It would have been impossible for a tug, without endangering itself and other vessels, to have attempted to move the scow from the slip. While additional lines might have been put out, this would not have prevented the banging of the scow against the side of the ship, which was the immediate cause of the damage. Consequently I conclude that the damage suffered was the inevitable result of the extraordinary and unprecedented storm. Of this storm the defendant had full warning, and ample opportunity to move the scow from a berth notoriously unsafe under northwest storm conditions.

I find the facts in this case as I have recited them, and conclude, as a matter of law, that the defendant is liable under the terms of its charter for having failed to return the scow in the same condition as received, and, further, that the plaintiff is entitled to judgment against the defendant for the reasonable cost of repairing the scow, which will be determined upon the submission of additional proofs, that question having been reserved until after the determination of the merits.