**THE DUNNIGAN SISTERS.**
**THE GOWANUS.**

**DUNNIGAN v. MURRAY TRANSP. CO.,**
**Inc., et al.**

**MURRAY TRANSP. CO., Inc., v. DUNNIGAN**
**et al.**

District Court, S. D. New York.
Oct. 23, 1931.

Alexander, Ash & Jones, of New York City (Edward Ash, of New York City, of counsel), for libelant Dunnigan.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for Murray Transp. Co.

Carter & Phillips, of New York City (Peter S. Carter, of New York City, of counsel), for Gowanus Towing Co.

Haaren & Barrett, of New York City (Jos. A. Barrett, of New York City, of counsel), for Barnes, McNamara & Morrissey, Inc.

Arthur J. W. Hilly, Corp. Counsel, of New York City (William J. Leonard, of New York City, of counsel), for City of New York.

Duncan & Mount, of New York City (F. A. Bull and Chas. R. Millett, both of New York City, of counsel), for cargo ex Dunnigan Sisters.

First. On the Criminal Contempt for Perjury, October 22, 1931.

WOOLSEY, District Judge (after all parties had rested at the end of the case).

I hold Joseph Dunnigan in criminal contempt of this court for having willfully testified falsely regarding a material matter in these causes.

I. In open court, just before we adjourned yesterday, I told Mr. Ash, the counsel for the libelant, Catherine Dunnigan, that in my opinion Joseph Dunnigan, her son, had consciously and willfully perjured himself in the evidence which he had given on this trial when he said he was on board the scow Dunnigan Sisters on Sunday evening, January 20, 1929, and saw the accident.

II. I was coming to this conclusion from various items of evidence that had come out early in the trial, but I was finally confirmed in it when I heard the testimony given yesterday by two of the witnesses who had met Dunnigan when he arrived on Monday morning, January 21, 1929, at the scene of the disaster. By that testimony it was shown that Dunnigan was first informed that morning of the sinking of the scow Dunnigan Sisters.

III. In dealing with this matter in this way, I want it to be distinctly understood that there does not attach to Mr. Ash or to the members of his firm, all of whom are well known and highly regarded by me, the slightest criticism of any kind in regard to the false story which was told by this witness when he testified.

IV. It is most unfortunate that a matter of this kind should occur, but it seems to me that, when it does occur, and when a judge becomes aware of it, he should, in so far as his doing so is consonant with appropriate and dignified procedure, punish those who are guilty; for it is settled law that willfully false evidence as to a material fact given in the presence of the court or a contumacious attitude of a witness who has been sworn in court constitute criminal contempt of court because they are obstructive of justice.

I think that offenses of this kind too often escape notice, and that, when they are suspected, they are not often enough followed up by punishment.

V. In this case, after I had spoken to Mr. Ash, he conferred with his client and with the witness Joseph Dunnigan, and he informed me this morning that, after persisting until this morning that his story was true, Dunnigan finally admitted that it was false, and that he had not been present on board the scow on the night of Sunday, January 20, 1929, as he testified he had.

Various circumstances such as the fact that his wife was ill, that he has two small children, that he is working for his mother, who is an old woman, were put forward as reasons why the punishment, which I told Mr. Ash I should have to give him, should not be too severe.

VI. There is nothing which occurs in our courts more to be deprecated nor to be punished more promptly when such punishment is procedurally possible than conscious willful perjury in a trial. The offence in this case I think is aggravated by the fact that the libelant was the mother of the witness. Whether she was aware of the fact that his story was not true I do not know. That is not before me. But this witness has confessed, and, I must say this much to his credit, has at last met the situation in a manly way.

After anxiously waiting during the day, he has taken the stand and stated that what he testified to at the commencement of the trial with regard to what he considered to be, and what is a most important question, namely, the watching of the scow on the night of the accident, was not true.

VII. It is a disagreeable but necessary duty for courts to punish instances of this kind of perjury, for which an offense tends to undermine the foundation of justice, which is truth.

On the other hand, in dealing with the punishment which should be imposed, I have to consider the fact that the witness, though certainly under pressure, has allowed his better self to rise to the surface, and has confessed openly before me and before all the counsel present and all the other witnesses the falsity of his story. He has not forced me to turn him over to the United States Attorney for criminal prosecution for his perjury, nor has he forced me to hold a special hearing on the question of the truth of his evidence as would have been necessary if he had persisted in a denial that he had perjured himself.

In effect, his testimony on rebuttal, confessing his previous false testimony, is a plea of guilty to a charge of criminal contempt, and I shall so treat it.

But I shall not give him so heavy a punishment as I should have given him, if, after a hearing on the matter, I had been forced to find that he was guilty of the perjury now admitted.

I think that under the circumstances shown, in view of his change of attitude, a fair punishment—given with the hope that it will serve as a warning to other witnesses who may be tempted to follow a similar course of false swearing before me or any

other judge of this court—will be to commit Joseph Dunningan to the United States Detention Headquarters for a period of fourteen days, commencing from this afternoon.

The marshal will be here at once to take him in charge.

(Various counsel present requested that this sentence should be suspended, or at least that there should be an opportunity for Joseph Dunnigan to take his mother home to Haverstraw in his car, which was waiting outside the court. After these arguments were heard, the court continued.)

I will not suspend the sentence, but I will do this: I will suspend the commencement of the sentence until tomorrow, and parole Dunnigan in your custody, Mr. Ash, so that he can take his mother home, and you must see that he is here in court to-morrow morning. You can then take up with me further, if you wish, the precise sentence which I shall give him. He has to have some punishment, and I think that what I have given him is a very moderate punishment considering the nature of his crime.

His mother was going to benefit from his perjury, if his testimony had been believed, and she had been successful in the case. As I have said, I do not know whether she knew about his testimony beforehand or not, but she was going to benefit by it, and probably he was going to benefit indirectly also. It is a sordid situation.

I have strong feelings on matters of this kind, and I believe so much in candor, no matter whom it may hurt, that I cannot suspend the sentence. But I will parole him in your custody so that he may take his mother home.

Second. On Reargument by Mr. Ash on October 23, 1931, as to the Sentence to be Imposed on Joseph Dunnigan.

WOOLSEY, District Judge (continuing).

The answer to your plea for a change in the sentence is that there cannot be any change.

I. The recanting and changing of evidence on the part of Joseph Dunnigan was not the result of a yeast working in himself, of his own conscience; it was the result of my suggestion to you that you should find out about his story and force him to tell you the truth, because I felt from the evidence which I had heard, and from observing him, that he was not telling the truth.

It was only as the result of your efforts made at my suggestion that he came forward and told the truth finally.

Now I am going to set my face with the utmost sternness against loose ideas of testifying. They are getting far too current in our courts. Consequently, I will maintain the sentence which I gave before—for fourteen days in the United States Detention Headquarters.

If Dunnigan had not recanted, and if I had found after a hearing or at the end of the argument in this case that he had been testifying falsely, I should not have hesitated to give him a sentence of from sixty to ninety days.

It was only because of the fact that he did recant, and because of the circumstances of his family, which appeal to me as reasons for a light punishment, that I reduced the sentence, which I intended to give him, to the short sentence which I am now giving him, of fourteen days, and I am going to leave it at that.

II. I have to say further that it was perfectly proper for you, Mr. Ash, as Dunnigan's counsel, to ask clemency for him, but I confess that when, yesterday afternoon, after you had made your very earnest plea in his behalf, all the other lawyers in the case, except perhaps Mr. Carter, also arose and pleaded for him in one form or another, I was amazed.

It is difficult to see how a judge is going to improve the present unfortunate situation regarding perjury at trials, if, when he has a clear case of admitted perjury before him, and an opportunity to punish a witness who, as here, has made up a story out of whole cloth, the bar does not support him in his action, but, instead, opposes all punishment.

Members of the bar, both in informal groups and in formal associations, often meet and talk about the amount of perjury there is in trials, and criticize judges because perjury is not more often punished. But here, when a clear case arises and a particular witness has to be punished for committing an admitted perjury, the members of the bar involved in the case rise in a body and ask the court not to do anything about it—it was a regrettable exhibition, and not to be passed over without comment.

III. I will sign the commitment now, and we will then go on to the argument of the case.

(The commitment was then signed, and Dunnigan put in the charge of the marshal.)

The argument proceeded, and, after it was concluded, the following decision was rendered:

Third. Decision on the Merits.

WOOLSEY, District Judge.

My decision is that the libel in the first case should be dismissed with costs, and, inasmuch as the libelant started the proceedings against the Murray Transportation Company which I have held were unfounded, and the Murray Transportation Company justifiably impleaded other parties, who in turn impleaded still other parties, I hold that the costs of the impleaded parties should be payable, first by the libelant, and, secondarily, only, by the petitioner impleading the respective parties.

On the second libel I allow the libelant a recovery against the scow Dunnigan Sisters and against her owner, Catherine Dunnigan, with costs, and with a reference to ascertain the damages.

I dismiss the libel, with costs, as against Barnes, McNamara & Morrissey, Inc., and against the tug Gowanus, also as against the city of New York impleaded.

The costs of the impleaded respondent in this case must be taxed against the petitioner Dunnigan because the libelant has prevailed on his libel.

The answer of the owner of the scow Dunnigan Sisters pleads the limitation statute in this second suit.

It has been suggested on the argument that a separate limitation proceeding shall be had in regard to this plea, and at first I was inclined to fall in with that view; but, on consideration, it seems to me that this question, which is really a question of the extent of the damages, could properly be referred to the commissioner who will be appointed to assess the damages against the scow Dunnigan Sisters and her owner, and, accordingly, I shall follow that course as probably being the easier course for all the parties and the more convenient course for the court.

I. This is a multi-partite case, so far as the parties are concerned, but in reality it is very simple in pattern.

In the first suit, the owner of the brick scow Dunnigan Sisters brings a libel against the Murray Transportation Company which had her under the familiar type of harbor demise charter, and the Murray Transportation Company has impleaded the tug Gowanus which took the scow to the berth where she was damaged, and also Barnes, McNamara & Morrissey, Inc., who were the consignees of the cargo as agents for the owners thereof, and the Gowanus Towing Company, owner of the tug, has brought in the city of New York on the ground that the berth furnished was an improper one.

The second libel by the Murray Transportation Company, the demise charterer of the scow as bailee of her cargo against the scow Dunnigan Sisters and her owner; against Barnes, McNamara & Morrissey, Inc., her consignee; and against the steamtug Gowanus. The Gowanus Towing Company, the owner of the tug Gowanus, as in the first case, petitioned in the city of New York for a greater measure of protection.

II. The cargo which the scow had on board consisted of 422,000 bricks which had been shipped at Mechanicville, N. Y., and for which a receipt, for economy's sake made out on a Clyde Line bill of lading, was signed. The receipt was dated November 10, 1928.

The vessel was brought down the river by a Cornell Steamboat Company tug and landed at Fifty-Third street on November 14, 1928. She lay there until the latter part of December, when she was moved by another Cornell tug to the foot of Court street, Brooklyn, the mouth of Gowanus creek, with the intention of having her taken up to a prospective purchaser of her brick in the creek.

It was found, however, that her beam was such as not to enable her to pass through the bridges on the creek, so her consignment had to be changed and another purchaser found for the bricks on board her.

Finally, a man named Klein was found who purchased the bricks and wanted them sent to what is known as the Thirty-Third street district, which lies between Twenty-Ninth street and Thirty-Fifth street, Brooklyn, and contains, as I recollect, about seven berths at which brick scows are customarily discharged. Accordingly, Barnes, McNamara & Morrissey approached the city dockmaster having charge of that district, a Mr. Bishop, who has testified here, and took up with him the question of a berth in that district.

Mr. Bishop told them that there would be a berth at the bulkhead at the foot of Thirty-Fifth street, Brooklyn, to which the Dunnigan Sisters could be sent on Saturday, January 19th. Accordingly, she was taken

down to that berth on the morning of Saturday, January 19th, by the tug Gowanus, and was left moored in the slip with her starboard side to the bulkhead at a point near a pier leased by Luckenbach. Thus she was left in space which is part of Luckenbach's leasehold, which extends to about the middle of the slip.

III. Turning now to the fixed features of the locus in quo, I think perhaps it will be well to describe them in order to make clear my point of view regarding the case.

The slip at Thirty-Fifth street is 170 feet wide, and points practically northwest, and so is open throughout its length to any northwest winds.

The construction of the bulkhead, which rises about 12 feet, as I remember, above mean low water, is of two large concrete blocks which are set at the bottom, and the upper one of which shows at low water. Above this concrete is what is known as a 3-foot "batter"; that is, a slope away from the perpendicular and toward the shore, such that the upper end of the bulkhead is 3 feet further away from the perpendicular than the lower end. This bulkhead rise is faced with granite.

The nature of the bottom of the slip and the soundings thereof have been the subject of a great deal of evidence and most commendable effort on the part of the attorneys—indeed, the case has been prepared with what I might say were efforts worthy of a better cause.

The depths of water, which is all brought to read at mean low water, are shown substantially the same on the charts submitted by the city and by the parties antagonistic to the city.

It shows that at the bulkhead commencing in the corner of Luckenbach's pier the water is 14 feet deep; that 10 feet out along the bulkhead it is 15 feet; 40 feet out, 17 feet; 60 feet out, 14 feet; 80 feet out, 12.5 feet; 100 feet out, 9 feet; and 120 feet out, 7 feet deep.

Measured out from the face of the bulkhead, the water, however, deepens quite rapidly.

There was one chart submitted as an exhibit by the Murray Transportation Company in the first case in which a government hydrographer had examined the slip and claimed to have found a shoal about 85 feet from the Luckenbach pier, in which he described a very hard bottom with rocks or boulders. It seems that the method in which

he sounded and arrived at this conclusion was to take a lead disc on a surveyor's line and drop the disc into the water. This apparatus was heavy enough to sink, but, of course, when it struck anything in which it would not sink, the line would go slack, and, though the sounder would be able to read the depth of the marks on the line, he could not feel the bottom.

It is claimed by the witnesses for the city that, although such a device would give the soundings to solid bottom, it would not give any suggestion as to the nature of the bottom. I entirely agree with them, and accept their theory that the only sure method in which you can find the nature of a bottom by soundings is by using rods which by their thrust will enable you to feel whether you are striking something hard or something which you can penetrate, such as mud.

An experiment was made with rods on Tuesday last by one of the city employees off the bulkhead, and he found that he could drive the rods 20 feet into the mud up to any point before the alleged shoal occurs, and at the shoal he could drive it 16 feet, which would mean, as I recollect it, about 9 feet into the mud there. That certainly is not a hard bottom.

The nature of the bottom was further investigated some time in April, 1930, if I recollect correctly, by a diver sent down by the insurer of the cargo—at any rate he was called by counsel for the Murray Transportation Company as bailee. This witness admitted that the bottom was what would properly be considered a soft bottom. He laid his ladder over the bulkhead at a point some 60 feet from the Luckenbach pier, walked along the bottom to a point near the pier, and about halfway between the point where he had taken to the water and the pier itself, i. e., about 30 feet off the Luckenbach pier, he found that there were six 10-inch piles with rubble between them which were half covered by the base of the bulkhead, and, undoubtedly, constituted part thereof. This meant that there was a slight projection of, say, 5 inches at that point. He then went about the same distance in the other direction from his ladder, towards the government pier on the south side of the slip, and found two piles which were 5 inches from the face of the bulkhead and had rubble between them— about 90 feet from the Luckenbach pier—so that with their 10-inch diameter it would be a total projection there of only 15 inches.

Grasping at every possible reason for condemning the berth, counsel attacking it

have claimed that there was a hard slope at the shoal which might damage vessels, and have clutched with satisfaction at the fact that the bulkhead itself had a slight projection of about 5 or 6 inches between the two concrete blocks out of which it was composed and at a distance of some 5 or 6 feet below low water, and also have emphasized the projections at the piles just described.

I think they have very much overestimated the possible effect of these projections in holding a vessel up from sliding into deep water with the fall of the tide. Indeed, I think that the sketch by Mr. Mayhew, which was the first exhibit presented to me, if it is right in its figures, shows that the ledge did not hold the vessel up, and it also shows that, apparently, from his soundings there was a sudden falling away from 6 feet 7 inches at the bulkhead at low tide to 14 feet 5 inches at the port side of the scow, and that he sounded 16 feet slightly beyond.

Therefore, within a distance of 41 feet from the bulkhead, the bottom fell away from 6 feet 7 inches at low water to 16 feet. With the kind of soft bottom which I think it is perfectly fair to find existed there, it seems to me perfectly clear that a scow properly moored with her lines properly tended would have slid off down this bottom contour into deeper water, and would not have suffered damage in spite of the unusual fall of the tide.

IV. Now turning from the fixed elements of the situation to the moving and floating elements, I find that the scow Dunnigan Sisters arrived shortly before noon on the 19th of January, that the tug Gowanus, who had her on her starboard side, swung her round, floated her into the berth above described, and then cast off from the scow after the scow herself had two lines on the bulkhead.

The wind that morning was blowing about from the west, with a force of 42 miles an hour between 10 and 11 a. m.; 40 miles an hour between 11 and 12 a. m.; so that it is quite evident that there was considerable wind coming in at that time, but the scow was somewhat sheltered from a westerly wind by the covered piers, and, consequently, I do not think it was negligent on the tug's part to leave her at the bulkhead in the wind that was then blowing. I have no fault to find, therefore, with the tug upon this point.

It is testified, and I find, that the harbor master representing the city in that district, Mr. Bishop, told the acting master of the scow, a man named Cullen, who described himself as a chef, and was really only a substitute for the owner's son Joseph Dunnigan, the real master of Dunnigan Sisters, that he should not moor alongside the bulkhead for over the week-end, because there would surely be some northwest weather, and that there was a shoal towards his stern. Cullen did not answer, but merely, when asked for whom his brick was consigned, and by whom he was sent there, said his brick was consigned to Klein, and he was sent there by Barnes. Although the remarks of the city dockmaster were addressed to Cullen at a distance of 2 or 3 feet, Cullen claims not to have heard anything said to him about the berth or to have seen anybody there. I find against him, and I find that the evidence of the city dockmaster is supported in all respects by the evidence of Luckenbach's wharf master. The city dockmaster said that he suggested to Cullen that he pull alongside of Luckenbach's pier and thus have his bow to the wind, instead of lying alongside the bulkhead. Apparently these suggestions fell on unheeding ears, for nothing was done. With the help of a brick handler whom Cullen had signed on, the Dunnigan Sisters was moored with a spring line from her forward starboard corner to a bollard on the Luckenbach pier outside the gate, and with a breast line rather ineptly leading from the middle bitt on her bow directly on to a bitt on the stringpiece of the Luckenbach pier. And astern she had a spring line running from her starboard after corner and a breast line from her port after corner.

Cullen testified that he felt ill and went home after the mooring, and telephoned up to Joseph Dunnigan in Haverstraw on the afternoon of Saturday that he could not stay with the scow. Feeling better the next morning, however, he went down on board the scow, found that she had weathered two low tides successfully, and then returned to his home, went to bed, and remained there ill for several weeks.

Joseph Dunnigan first testified that he came down on Sunday afternoon, took charge of the vessel, and was on board of her when she sank. He described her sinking with picturesque detail, and dilated on his unsuccessful efforts to secure help. Later, on rebuttal, after his counsel had put pressure on him at my suggestion, he admitted that this was an entirely fabricated story, and that he was in Haverstraw that night. Consequently, I ordered that the evidence Dunnigan first gave should be stricken out as confessedly false so far as it was material.

Admittedly, therefore, the scow was unattended Sunday night, January 20th, when she sank. The wind blew hard from the west and northwest, mostly from the northwest, all Sunday afternoon and evening. Its force averaged 38 to 39 miles per hour up till 11 p. m. The result of such winds is, I am told, usually an abnormally low tide in the harbor.

The only evidence we have as to what happened Sunday night was from Luckenbach's watchman, who says that the scow sank some time between 11 and 12 p. m., but that she had begun to lean over between 9 and 10 p. m., and he called up Merritt & Chapman to see if they could do anything about it, but was unable to get any help.

The tide on the night of Sunday, January 20th, at low water at 10:30 p. m., was 2 feet 5 inches below the normal low-water mark.

The scow Dunnigan Sisters had a length of 114 feet, a beam of 35 feet, a depth of side of 9 feet 6 inches. She had an amidships depth of about 8½ to 9 feet. Her construction was the usual brick scow construction. She had hatchways, and carried her cargo of brick on deck in two divisions separated by what is called the break, in which there was a hatch.

Her history was good, and I find that she was entirely seaworthy, and that no leaks or unseaworthiness in her hull contributed to the accident.

V. I think a case of this kind has to be approached, within the general rules as to the liability of wharfingers, by the trier of the facts on the basis of what the situation was in its entirety, and whether there was negligence by anybody in connection with that situation, and, if so, by whom.

 As Judge Learned Hand said in United States Trucking Corporation v. City of New York (C. C. A. 2), 18 F.(2d) 775, at page 776: "The duty of a wharfinger for hire to use reasonable care to furnish a safe berth is beyond dispute (Smith v. Burnett, 173 U. S. 430, 19 S. Ct. 442, 43 L. Ed. 756), and has been settled in many cases. But it is a sufficient discharge of his duty, if he warns vessels who use it (Schoonmaker v. N. Y., 167 F. 975 [C. C. A. 2]; The Imp [D. C.] 225 F. 668), though the burden is on him to show that this was done."

Then, after discussing the particular facts in the case before him as to whether the warning was sufficient in that case, he says, referring to a case of this kind: "In such cases it is indeed always a matter of degree how far the party primarily charged may safely rely upon the prudence of those who come upon the situation. There can be no general rule, and there will be no certain agreement. In laying down the relative duties in this situation we can do no more than attribute them as seems most reasonable, given the habits of ordinarily cautious people."

Cf. also Panama Railway Co. v. Napier Shipping Co., 166 U. S. 280, 288, 17 S. Ct. 572, 41 L. Ed. 1004.

VI. Now I feel that I have got into this case very thoroughly. It has had a somewhat tragic aspect in view of the fact that I had to punish the witness Dunnigan for contempt, but it has been a very interesting case.

 I find that the berth furnished the scow was a safe berth; that the bargee was notified both of any weather dangers and of the shoal; that the man in charge of the barge was not a man of great intelligence, and that he did not, apparently, thoroughly appreciate the information given him; that he was ill, and, when he went home and left the barge on Saturday and came back on Sunday, he supposed that he had made arrangements for Joseph Dunnigan to stay on board Sunday; but, as above found, there was not anybody on board her.

 I find that at the time of year in question it was expectable that, with northwest winds, there would be an effect on the bodies of water in New York harbor such as would lead to unusually low tides, and that, as this was expectable, it should have been known by the owner of the scow, and that, consequently, the scow should have been tended; there should have been somebody on board of her during the night who could have been able to slacken or cast off her lines, if necessary, and as the tide fell let her slide off into deeper water.

This accident, I feet confident, would never have happened if the scow's lines had been properly handled.

I think it is the strongest possible confirmation of the correctness of my finding that it was necessary to have some one tending her at that time of year during the night, and that, indeed, my finding is brought almost to the point of demonstration by the fact that Joseph Dunnigan, the owner's son, was willing, in order to establish the fact of his presence on board, to commit the most barefaced perjury that has come to my at-

tention, and make up a story of the sinking out of whole cloth. One could hardly imagine a more significant admission of the fact that the scow should have been tended.

Furthermore, it was quite clear from an examination of the scow on Monday, January 21st, that she was "hung" by her lines, and but for them would have slipped down the contour of the bottom into deeper water. Her tendency to do so, is, I think, plainly shown by the fact that she broke both her breast lines. Her spring lines held, however, and she could not free herself. If her lines had been properly tended and slackened, this case would not have arisen.

I find, therefore, that the vessel was put in a safe berth, continually used by vessels of her kind in the brick trade, and that the accident which occurred was due to the fact that she was left unattended overnight when there was an unusually low tide to be expected, and when the season of the year made it unsafe to leave her unattended; that the accident was due solely to the scow's not being properly tended, and that there was nothing in the berth, the conformation of the bottom, or in any other respect for which the city, or those who ordered the vessel to that berth or arranged for her to go there, would be in any way responsible.

I think that scows and barges and other vessels without the power of self-propulsion should have persons on board in charge of them whilst they are moored to the piers hereabouts.

I do not think owners of scows can be properly allowed to succeed in cases like this when their vessels are left alone. Certainly in the present case there was a good reason why she should have been tended, and that was recognized by her owner.

VII. How my decision leaves the question of limitation I do not pretend to say. It may be that on examination it will appear that the owner, Catherine Dunnigan, who is seeking limitation, knew that her son was not coming down on the night in question, and that such knowledge would affect her right to limit; but I leave that entirely to the commissioner, who will be appointed to assess damages.

VIII. An order may be entered making this opinion the findings of fact and conclusions of law for the purposes of the present case.

After such an order has been entered, decrees may be presented for signature.

A final decree may then be presented for signature in accordance with the decision which I gave at the outset dismissing the libel in the first cause with costs as above provided. In the second case an interlocutory decree allowing a recovery to the libelant against the scow Dunnigan Sisters and her owner, Catherine Dunnigan, with a reference to compute the damages, and a special instruction to the commissioner appointed that he shall deal with the defense of limitation of liability in Dunnigan's answer and report with the evidence thereon in connection with his report on the damages, stating whether he thinks that the owner of the Dunnigan Sisters is entitled to have her damages limited, and, if so, to what amount the limitation should be allowed.

The orders and decrees may be submitted for signature on three days' notice.