## THE HARRY R.
## THE IRVING.

### CONNERS MARINE CO., Inc., v. DELAWARE, L. & W. R. CO.
#### Nos. 12277, 12278.

District Court, E. D. New York.
Jan. 26, 1932.

Thomas A. McDonald, of New York City, for libelant.

John E. Morrissey, of New York City, for respondent.

BYERS, District Judge.

These cases were tried together, and are in personam to recover the amount of damage suffered by the lighters Harry R. and Irving, owned by the libellant and under demise to the respondent; the captain of each lighter was employed by the libellant.

The vessels were in good condition when delivered to the charterer, but, upon return, were found to be damaged, and the question of responsibility requires determination.

On April 1, 1929, the lighters were in the slip on the south side of the pier at the foot of 31st street, Brooklyn, and the occupancy of the slip must be understood. The steamer Estrella was alongside the pier, bow in, at the outshore end, but her stern was 150 feet inside of the pier end. On her starboard side and opposite hatches Nos. 3 and 4, aft of amidships, were moored the barges or lighters Bessie and King; the latter being outside and made fast by two side lines to the Bessie. Ahead of these two vessels, opposite hatches Nos. 1 and 2, at the bow quarter of the Estrella, was the lighter or barge Rainbow, lying bow out, and made fast to the steamer with two bow and two stern lines. About 150 feet directly ahead of the steamer, were three barges or lighters, abreast, of which libellant's Harry R. was outside, lying bow in. The inside barge was moored to the pier with two side lines. The barge next outside was made fast to the inside barge, and the Harry R. was made fast to the center barge, by similar lines.

About 20 feet ahead lay two other barges abreast; the inside being made fast to the pier in the same way, and the outside being the libellant's lighter Irving, bow in, made fast to the last-named by two similar lines. There were still other barges abreast and alongside the pier and ahead of the last two. At the bulkhead and lying across the slip was a coal barge.

At 5 o'clock in the afternoon of the day in question, the captains of the two lighters here involved telephoned to the office of the tug dispatcher of the respondent to ascertain if there were any orders which would require their presence on board during the night to watch cargo and, being informed that there was none, they left their vessels.

On the following morning, the Rainbow was lying across the bulkhead alongshore, and directly outside was the middle barge of the three that were lying directly ahead of the Estrella in the position described, and outboard of her was the Harry R.

The two barges or lighters which had occupied a position alongside the Estrella, opposite hatches Nos. 3 and 4, namely, the Bessie and the King, had also changed their positions. The Bessie lay alongside the pier in the southerly side of the slip, and the King was alongside the coal barge at the bulkhead. The lighter Irving was in the same position she had occupied on the afternoon of April 1st, i. e., her lines had held.

The damage to the Harry R. was in the vicinity of her starboard stern corner, starting amidship; and the damage to the Irving

was at the port stern; it is argued by the respondent that the facts show that during a heavy blow which occurred during the night the lines of the King parted, causing her to strike and cast loose the Rainbow and then to strike the Harry R., and later the Irving, and that this was an inevitable accident, not due to negligence on the part of the respondent, and consequently that liability should not attach to it for the damage.

It should be stated that the slip is about 240 feet wide, and the piers project into the river in a northwesterly direction. The pier in question is some 1,300 feet long and covered with a shed, and it will be observed that, as libellant's lighters lay well into the slip, they were protected from a northerly wind by the pier shed, and partially from a northwesterly wind, by the Estrella and the vessels moored on her starboard side.

From 12 o'clock noon until 2, a southerly wind of a velocity of 20 miles prevailed. At the latter hour the wind shifted to the southwest; between 2 and 7 o'clock, the velocity increased from 29 to 45 miles, with a maximum during the last hour of 54 miles.

At 7 o'clock, the wind shifted to the northwest, and there held, and between that hour and midnight the velocities varied between 47 and 45 miles; the high velocity being reached between 9 and 11, when the average was about 53, with a maximum of 62 miles.

The extreme velocity recorded during this period was 72 miles an hour, between 10 and 11 o'clock.

Mr. Scarr's testimony as to storm warnings indicates that such were hoisted at 11 a. m., "southwest warnings at New York, and southeast from Nantucket eastward." A southwest warning in New York means that the storm will begin from the southwest. Mr. Scarr said: "Where it goes afterwards is a matter for further calculation."

The testimony is that this was a severe wind, and the full strength of such a northwest blow would be directly into the slips at this point.

Mr. Scarr testified that the press, radio and telephone advices, if sought, would have supplemented the warning as to the area between Nantucket and Hatteras, by the information that the southwest winds would shift to strong westerly winds and gales during the night of April 1, 1929.

After midnight of April 1st, the wind was from the northwest and the west, and the average velocity gradually diminished from 48 to 31 miles at 6 o'clock in the morning. The press and advisory storm warning last above referred to was issued at about 9:30 on the night of April 1st, and was for publication in the papers the following morning. It should be stated that the anemometer in use during 1929 recorded a lower velocity in miles than the one used prior to 1925 and reinstated as of January 1, 1932. It is estimated that the highest velocities above referred to would be recorded as between 80 and 90 miles an hour on that.

The redelivery of the lighters in damaged condition by the respondent having been shown, its presumptive negligence must be explained away in order to defeat the libels. Cummings v. Pennsylvania R. Co. (C. C. A.) 45 F.(2d) 152; Bushey & Sons v. W. E. Hedger & Co. (C. C. A.) 40 F.(2d) 417, and authorities cited in those opinions, as also in The White City (C. C. A.) 48 F.(2d) 557, at page 558.

There can be no doubt that the barge King parted her lines from the Bessie at about 11 o'clock or a little later, for the bargee on the latter secured assistance from a Lehigh Valley tug at about that hour, and was moved across the slip to the southerly side, around that time.

The subsequent movements of the King have not been shown, except that a witness on the pier is sure that he saw her moving in the slip at around 2 o'clock in the morning. Some one made her fast alongside the coal boat, as has been stated, but no witness was called to prove that the King was damaged at all, and hence whether she struck either or both of respondent's lighters on her progress inshore is left to conjecture.

The Rainbow likewise parted her lines during the night, and was moored to the bulkhead by some undisclosed agency, where she was found next morning with twelve broken planks, and the bow port chock pushed out. Whether that damage was caused by the King's striking the Rainbow, or by the latter's swinging around and striking the Harry R. after the Rainbow's weather lines had parted, is also not shown.

These two vessels were under charter as to the King, and ownership as to the Rainbow, by the Mallory Steamship Company and the New York Central Railroad Company, respectively, and the libellant brought suit against them jointly and severally, in the Municipal Court of the City of New York, to recover the damages herein involved, on the theory that the two vessels were improperly and insufficiently moored, and were

caused to go adrift and strike the lighters. In one action, there was a nonsuit (Rainbow), and in the other (King) the jury rendered a verdict for the defendant.

■ Upon the record now under examination, it cannot be said that the respondent has shown how the damage occurred. It remains to ascertain whether, having shown all that was done with respect to these lighters, any of its acts was negligent. The libellant's contentions will be considered in the order in which they are advanced:

A. *The Storm Warning.* In terms it was of a southwest blow according to the testimony. The libellant's brief quotes the warning verbatim, and, although this goes beyond the evidence in the case, it may be accepted:

"Hoist southeast storm warning eleven A. M. Nantucket to Eastport, and southwest storm warning from Nantucket to Hatteras, storm central over southern Lake Huron will cause fresh to strong southeast winds on the New England coast shifting to southwest gale late tonight or Tuesday and fresh to strong southwest winds Nantucket Hatteras, shifting to strong westerly winds and gales tonight."

The concluding words are relied upon as casting a burden upon the respondent, the failure to discharge which is said to have constituted negligence.

In order so to decide, it would be necessary to hold that the position of the lighters was so exposed that the respondent should have anticipated that one or more of the barges or lighters lying outboard of these two would be cast adrift, as the result of the anticipated westerly gales. This is thought to suggest an unreasonable and impracticable standard of foresight. Particularly as the later direction of a southwest wind is a matter for "further calculation," as has been shown.

Nicholson v. Erie R. Co. (C. C. A.) 255 F. 54, is cited as being appropriate to this case. The facts are so different that a discussion of them is not requisite.

It may be considered that this slip is so situated that an entering northwest wind would be extrahazardous, without proving that these lighters were in an exposed position, because of the presence of the protecting vessels and pier shed, to which reference has been made.

■ B. *Absence of Captains.* This is thought not to indicate negligence of itself. See Kathryn B. Guinan (C. C. A.) 176 F. 301, in which it is said: "There is no evidence of any custom to keep watchmen on boats lying in the slips of New York Harbor, and such a burden would be very onerous."

The cases in which the foregoing rule has not been applied have been examined, and found to involve weather conditions or storm warnings not here present, as, for instance, The D., L. & W. No. 442 (C. C. A.) 30 F. (2d) 250.

If a captain had been present on the Harry R., he might have telephoned for help, as did the one on the Bessie, at 11 p. m., but by that time the King had broken loose.

The Irving never left her mooring, so that what her captain could have done, if present, does not appear to be important.

The Dunnigan Sisters (D. C.) 53 F.(2d) 502, 1931 A. M. C. 1949 et seq., involves facts not here presented. The same remark applies to the storm warning in the Osaka Shosen Kabushiki Kaisha v. U. S. Lighter No. 1, 58 F.(2d) 999, in this court.

In Fox, Inc., v. United States (D. C.) 22 F.(2d) 351, 1927 A. M. C. 1604, the barge was maintained in an exposed position for many hours, in the face of a northwest storm warning.

The Headlight (C. C. A.) 300 F. 84, is as favorable to respondent as to the libellant, and contains helpful observations concerning the duty imposed by, and the interpretations of, storm warnings. It is of particular interest with reference to the lack of telephone inquiry during the night of April 1, 1929.

The respondent has demonstrated to the satisfaction of this court, that its handling of these lighters on April 1, 1929, was not negligent, i. e., they were not moored in an exposed berth; that the storm warning of 11 a. m. did not point to the reasonable likelihood that there would occur a northwest blow of such proportions that danger was reasonably to be anticipated from the casting loose of outboard vessels in this slip; and in consequence the libel in both cases must be dismissed, with costs.

If findings are desired, they may be settled on notice, and should contain appropriate recitals of ownership and incorporation. Settle decree on notice.