## PANAMA RAILROAD COMPANY *v.* NAPIER SHIPPING COMPANY.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 102.  Argued January 25, 1897. — Decided March 22, 1897.

The libel in this case was dismissed by the trial court.  The judgment of
that court was reversed by the Court of Appeals, and the case was
remanded for assessment of damages.  After assessment and decree it
was again taken to the Court of Appeals, where the decree of assessment
was affirmed, whereupon a writ of certiorari from this court was granted.
*Held*, that, upon such writ, the entire case was before this court for
examination.

Torts originating within the waters of a foreign power may be the subjects of a suit in a domestic court.

The facts in this case, as detailed in the statement below, do not show a negligence on the part of the railroad company and its agents, which makes it responsible to the shipping company for the damage caused by the accident to the Stroma.

THIS was a libel *in personam*, filed in the District Court for the Southern District of New York, to recover damages sustained by the libellant through injuries received by its steamer Stroma, while lying at the respondent's pier in the port of Colon.

The undisputed facts of the case were substantially as follows: The libellant was a British corporation and owner of the steamer Stroma, and the respondent a New York corporation, and the proprietor of certain piers known as piers Nos. 1 and 2 at Colon, in the Isthmus of Panama, and of a slip between those piers. These piers it was accustomed to let to vessels desiring to use the same, and to charge wharfage therefor. Between the piers, which were parallel to each other, was a slip about 135 feet wide, in which there was water to a depth of about 20 feet at the bulkhead, to 30 feet at the end of the pier. Pier No. 2 was about 450 feet in length, covered with a shed, in the sides of which were doors at intervals for the transfer of cargo to and from vessels lying at the pier.

For a few weeks prior to the arrival of the Stroma, respondent had been engaged in dredging the slip, and for this purpose had employed a steam dredge, 60 feet long by 30 feet wide, consisting of a shallow scow, upon which were a steam boiler, a crane operated by machinery and used for hoisting the refuse from the bottom of the slip, and a spindle about nine feet long, located in the middle of the forward end of the scow, constituting the pivot of the crane. On December 6, 1888, while the dredge was anchored in the slip between the piers, the port was visited by a storm known as a " norther," which was so violent that the vessel foundered and sank in the slip. Respondent secured a wrecking vessel and diver to raise the dredge and to remove it from the slip, operations

for which were begun December 15. The diver located the dredge as lying diagonally across the slip, the corner of the dredge being about 22 feet from pier No. 2; but owing to the turbidnes of the water he did not discover the spindle. He also found the crane and boiler detached from the dredge and lying upon the other side toward pier No. 1. He marked the dredge and detached machinery with buoys, located at the end of the crane, at the platform, at the boiler and at the two ends of the dredge, five buoys in all. Besides the buoys the wrecking boat itself was secured in the slip near the wreck, the head in and the stern towards the sea, with two lines running across to each pier.

The Stroma arrived in Colon about eight o'clock in the morning of December 31, drawing 11 feet forward and 13 feet aft, and, as she approached the piers, her consignee raised a flag at the end of pier No. 2 to indicate the berth she was to occupy. There was a shed on the pier, and in order to avail herself of the openings in the shed in the discharge of her cargo, the Stroma adjusted herself accordingly. She lay at the pier during the day discharging her cargo, and was there seen and visited by agents of the respondent. At about six o'clock in the evening, it was reported that there was something wrong in the engine-room, and upon the engineer going down, he heard a rush of water coming into the ship. An investigation disclosed a hole in the bilge of the ship's bottom on the starboard side, punctured by what was afterwards discovered to be the spindle rising from the deck of the sunken dredge. The deck of the dredge was fifteen feet under water; the spindle over seven feet in height, and about nine inches in diameter. The vessel continued to fill with water, and sank. Fifteen days later she was raised, temporarily repaired, and then brought to New York, where full repairs were made. A considerable portion of her cargo was ruined, and other portions damaged.

Upon a hearing in the District Court, the libel was dismissed, 42 Fed. Rep. 922, and upon appeal to the Circuit Court (in which court the appeal was pending when the act establishing the Court of Appeals was passed) the decree of

the District Court was affirmed *pro forma,* and an appeal taken to the Circuit Court of Appeals, which reversed the decree of the District and Circuit Courts, 1 U. S. App. 161, and remanded the cause to the Circuit Court for an ascertainment of damages, which were subsequently assessed in the Circuit Court, and a final decree rendered for $38,861.86. A second appeal was taken to the Circuit Court of Appeals, which, on April 19, 1894, affirmed the decree of the Circuit Court. 20 U. S. App. 568. Whereupon respondent was granted a writ of certiorari from this court.

*Mr. Frederic R. Coudert* (with whom was *Mr. David Keane* on the brief) for the railroad company.

*Mr. Wilhelmus Mynderse* for the shipping company.

Mr. Justice Brown delivered the opinion of the court.

The main question in this case is one of fact, and turns upon the point whether the accident to the Stroma was caused by the negligence of the respondent, or that of the libellant.

1. It is claimed that, upon this hearing, we are limited to the question of damages, for the reason that the writ of certiorari was issued after the decrees of the District and Circuit Courts, dismissing the libel upon the merits, had been reversed; the case remanded to the Circuit Court to assess the damages, a final decree of the Circuit Court for $38,861.86, and a second appeal to the Court of Appeals, which had pronounced an opinion affirming the decree of the Circuit Court, although no formal decree seems to have been entered at the time the writ of certiorari was issued. While this writ begins with a recital that "there is now pending" in the Circuit Court of Appeals, "a suit in which," etc., we think it is giving it too narrow a construction to hold that it was intended to bring before this court only the question of damages, then pending before the Circuit Court of Appeals, particularly in view of the fact that the petition for the writ

of certiorari set forth the facts of the case, and claimed that upon those facts the libel should have been dismissed — making no claim whatever that error had been committed in the assessment of damages. A difference of opinion existed in the courts below upon the question of liability, and the writ was granted to review the whole case as on appeal from the second decree of the Circuit Court, which was con-trary to its first decree, and was entered in obedience to the direction of the Court of Appeals.

If, under such circumstances, this court were powerless to examine the whole case upon certiorari, we should then be compelled to issue it before final decree, whereas, as was recently said in the case of *The Conqueror, ante,* 110, it is and generally should be issued only after a final decree. The case of *The Lady Pike,* 96 U. S. 461, is not in point. In that case there had been an appeal from a decree dismissing the libel, which was reversed by this court, and the cause remanded for an assessment of damages. A second appeal was taken from such assessment, and it was held that the reëxamination of the case could not extend to anything decided here upon the first appeal. So in *Ames* v. *Quimby,* 106 U. S. 342, it was held that after a new trial had been had, pursuant to the mandate of this court, and a second judgment rendered, no errors other than those committed after the mandate was received below can be considered here. To the same effect are *Roberts* v. *Cooper,* 20 How. 467; *Supervisors* v. *Kennicott,* 94 U. S. 498; *Clark* v. *Keith,* 106 U. S. 464; and *Chaffin* v. *Taylor,* 116 U. S. 567. But while the Court of Appeals may have been limited on the second appeal to questions arising upon the amount of damages, no such limitation applies to this court, when, in the exercise of its supervisory jurisdiction, it issues a writ of certiorari to bring up the whole record. Upon such writ the entire case is before us for examination.

2. There is no difficulty about the jurisdiction of a court of admiralty in this case. So far as concerns the subject-matter of the libel it is covered by the case of *Philadelphia, Wilmington &c. Railroad* v. *Philadelphia & Havre de Grace Tow Boat Co.,* 23 How. 209, in which it was held that

the jurisdiction of a court of admiralty extended to an injury received by a vessel, by running upon certain piles which had been negligently left in the bed of the Susquehanna River at Havre de Grace.   See also *Atlee* v. *Packet Company*, 21 Wall. 389, and 2 Brown's Civ. & Adm. Law, 203.

The fact that the cause of action arose in the waters of a foreign port is immaterial.   While in some cases it is said that a court of admiralty has jurisdiction of all torts arising upon the high seas, or upon the navigable waters of the United States, *The Commerce*, 1 Black, 574; *Holmes* v. *O. & C. Railroad*, 5 Fed. Rep. 75; *The Clatsop Chief*, 8 Fed. Rep. 767, the connection in which those words are found indicate that they were not used restrictively; and the law is entirely well settled both in England and in this country, that torts originating within the waters of a foreign power may be the subject of a suit in a domestic court.   The authorities upon this subject are fully reviewed in an exhaustive opinion by the late Judge Emmons in the case of *The Avon*, Brown's Adm. 170, wherein jurisdiction was taken of a collision occurring upon the Welland Canal in Canada.   To the same effect are *Smith* v. *Condry*, 1 How. 28; *The Ticonderoga*, Swabey, 215; *The Griefswald*, Swabey, 430; *The Diana*, Lushington, 539; *The Courier*, Lushington, 541; *The Halley*, L. R. 2 Ad. & Ec. 3; *S. C. L. R. 2 P. C. 193; *The Mali Ivo*, L. R. 2 Ad. & Ec. 356; *The M. Moxham*, 1 P. D. 43, 107.

Indeed, large numbers of collisions arise upon the Canadian side of the St. Clair, Detroit and St. Lawrence rivers, which would not be cognizable in our courts, if the general proposition claimed by the appellant were true, since by the treaty between this country and Great Britain the boundary line is located in or near the centre of the river.

Had both parties to the libel been foreigners, it might have been within the discretion of the court to decline jurisdiction of the case, though the better opinion is that, even under those circumstances, the court will take cognizance of torts to which both parties are foreigners; at least in the absence of a protest from a foreign consul.   *The Maggie Hammond*, 9 Wall. 435; *The Belgenland*, 114 U. S. 355; *The Courier*,

Lushington, 541; *The Havana*, 1 Sprague, 402; *The Invincible*, 2 Gall. 29; *The Johann Friederich*, 1 W. Rob. 35; *The Charkieh*, L. R. 4 Ad. & Ec. 120; *The Vivar*, 2 P. D. 29; *The Anne Johanne*, Stuart, Vice Adm. 43; *Thomassen* v. *Whitwell*, 9 Ben. 113; *Chubb* v. *Hamburg-American Packet Co.*, 39 Fed. Rep. 431.

3. Was there any negligence on the part of the respondent, or, to state it more accurately, was there any negligence with respect to the libellant, or of which it was entitled to complain?

The owners of the Stroma were represented at Colon by one Andrews, who was acting as the agent for William Warriner, the regular agent of the West India and Pacific Steamship Company, and the consignee at Colon of the Stroma. Learning that the steamer was about to arrive, Andrews wrote to Mr. Abello, the harbor master of the port and the freight agent of the Panama Company, asking him that a berth be assigned to the Stroma, which was expected to arrive in a day or two. In reply, Mr. Abello came to him in person, and, as Abello says, told him the West Indian, also expected, could go to No. 1 wharf, but that he had no berth for the Stroma. Mr. Andrews suggested to him that the seaward end of the north side of No. 2 wharf might be a suitable place, and Abello assented to his putting her there. Andrews admits that he had seen the dredge sink in the slip, but claims that "at the time it sunk it was lying close to No. 1 wharf, to which it had been moored," the distance between the two wharves being about one hundred and fifty feet. As his office was opposite Abello's, and but a short distance from the dock, he must have known that a diver had been engaged in the work of raising the sunken dredge, although he testifies that he could not say that he saw the diver at work, and did not remember being informed that the dredge was broken into pieces, which were scattered about in several places in the slip. He could hardly have failed to observe that no vessel had been moored on that side of the slip since the dredge sank. He denies that he had seen any of the buoys which had been placed to mark the position of the sunken dredge, and says

that he took it for granted that the railroad company, having had a diver at work on the sunken dredge for several days, knew whether this berth was safe or not; that he relied upon their knowledge for a safe berth, and supposed that the wreck was on the north side of the slip where he saw the dredge sink. It appears, however, that operations for raising the wreck had been progressing for about three weeks prior to the arrival of the Stroma.

The steamer arrived at about 8 o'clock in the morning of December 31, was met by a boat sent out by the agent of the company to direct her to the dock, and was ordered by the man in charge to go to pier No. 2, and find a berth on the north side of the wharf. As the steamer approached, the company's flag was displayed from the corner of the wharf, indicating the position she should take. As she neared the wharf, Andrews spoke to the officer in charge, reminding him of the dredge being there, pointing him in the direction, and then called out to the captain " hug in close to the wharf, and you will clear the wreck." The testimony of the supercargo of the Stroma was that, as the steamer swung along parallel with the pier, Andrews called out to the captain " to be very careful in backing up the dock and not permit the stern of the ship to swing out into the dock, as there was a sunken dredge somewhere up the dock that it might run foul of " ; and that similar instructions were given by Mr. Commager, an employé of the railroad company, who was standing on the dock awaiting her arrival.

This testimony is corroborated by Commager himself, who swears that, when he went down to meet the steamer, he reminded Andrews of the danger, saying : " I suppose you have not forgotten about that dredge," pointing out its position, and that Andrews did not answer him, but spoke to some officer of the boat, calling out and reminding him of the dredge being there. This testimony is also corroborated by that of the witness Muller, also an employé of the railroad company, who heard the conversation with Commager. It would appear that at this time the buoys which had been placed to mark the position of the wreck were still visible —

at least four witnesses swore to that effect, and there was practically nothing to contradict them. But as they do not seem to have been at all conspicuous we do not think that negligence can be imputed to any one for not observing them.

Had the respondent undertaken, through its agent, to provide a berth for the Stroma and see that she was properly moored, it would probably have been responsible for this accident; but it appears that Abello, the company's agent, on being applied to for a berth, merely assented to a suggestion made by Andrews, that the Stroma was a small steamer, and that he could very easily put her on the north side of No. 2 pier, on the other side of the obstruction (meaning thereby the seaward end of the wharf), to which Andrews replied that "if you will do that there will be no objection to your doing so." He further says that, in the same interview, Andrews told him that he had seen the dredge sink; that he had been on the wharf when she had sunk in the morning, and that he had witnessed her going down. Not only had Andrews undertaken himself to bring the ship to a berth, but he admits it to have been the custom of the place for the railroad company to leave the putting of the ship at the berth entirely under the management of the agent of the ship. Under such circumstances, it is clear that Andrews, knowing that the dredge was sunk somewhere in the slip, should have made further inquiries as to its exact location, since from their conversation, and from what Abello knew of Andrews' knowledge, he had a right to assume that Andrews had informed himself of the danger of the Stroma lying there, and of the spot where the dredge was sunk; or, at least, that he would look for the buoys and ascertain for himself.

In all the cases in which wharfingers have been held for casualties of this kind, the vessel has approached the slip in ignorance of the real condition of the bottom, and the respondent has been held liable, upon the theory that it was his duty to furnish a safe berth.

This test is manifestly inapplicable where the agent of the vessel is already acquainted with the danger, and assumes the responsibility of providing her with a safe berth. In this case

there was no misrepresentation or concealment, and if Abello did not point out the precise location of the dredge, it was evidently because he supposed, and had a right to suppose, that Andrews knew it already, or would make further inquiries if he deemed it necessary. It is altogether probable that both parties assumed that the Stroma, being a small steamer, drawing only thirteen feet of water, when there was twenty-two feet of clear water above the deck of the dredge, could safely lie inside, if not immediately over, the dredge, and that both overlooked the existence of the spindle; but if Andrews was apprised of the danger which the Stroma might incur by lying there, it is scarcely just to impose a liability upon the respondent for the consequences of the spindle — the existence of which did not appear to have been known either to Andrews or to Abello, and which, if known, neither party had considered of sufficient importance to specially provide against. It would doubtless have been more prudent for Abello to have informed Andrews fully and explicitly of the danger he was incurring, but we think that, under the circumstances, he discharged his legal obligation.

As the diver, who was sent down to locate and buoy the dredge, never discovered the spindle, owing to the extreme turbidity of the water, it is difficult to see how negligence can be imputed to the respondent for not having warned the master of the steamer specially against it. Indeed, so little appears to have been known about it that, when a consultation was called, after the accident occurred, at which Mr. Andrews and Mr. Dennis, an associate superintendent of the respondent, took part, no one of them was able to surmise what had caused the disaster — the general opinion seeming to be that the Stroma had settled upon a pile, or a piece of machinery dropped by a Spanish steamer. No one suspected that the dredge had caused the damage, until the diver and surveyors on the following day reported the fact. If, as we have already found, Mr. Andrews was either apprised of, or put upon inquiry, as to all the facts with regard to the location of the sunken dredge, respondent cannot be chargeable with negligence because it did not warn him specially against

the spindle, since it had not been informed of its existence by the diver, who does not seem to have been guilty of any negligence in not discovering it, and for whose negligence it is at least doubtful whether respondent would have been liable.

Inasmuch as we are of opinion that the Circuit Court of Appeals was in error in holding the respondent liable,

*The decree of the Circuit Court of July 7, 1891, must be affirmed, and the cause remanded to that court, with directions to dismiss the libel.*