Olga ZDANOK et al., Plaintiffs-Appellees,

v.

The GLIDDEN COMPANY, DURKEE
FAMOUS FOODS DIVISION,
Defendant-Appellant.

Frank T. ALEXANDER et al., Plaintiffs-
Appellees,

v.

The GLIDDEN COMPANY, DURKEE
FAMOUS FOODS DIVISION,
Defendant-Appellant.

Nos. 87, 88, Dockets 28276, 28277.

United States Court of Appeals
Second Circuit.

Argued Oct. 25, 1963.

Decided Jan. 29, 1964.

Frank C. Heath, Cleveland, Ohio (Jones, Day, Cockley & Reavis, Cleveland, Ohio) (Patrick F. McCartan, Cleveland, Ohio, of counsel), for defendant-appellant.

White & Case, New York City (Chester Bordeau and Charles F. G. Raikes, New York City, of counsel), on brief for defendant-appellant.

Morris Shapiro, New York City (Sahn, Shapiro & Epstein, New York City) (Harry Katz, New York City, of counsel), for plaintiffs-appellees.

Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

The much litigated and discussed case of Zdanok v. Glidden Company,[1] is back

---

1. For the history, see opinion dismissing complaint, 185 F.Supp. 441 (S.D.N.Y. 1960), reversed by a divided court, 288 F. 2d 99 (2 Cir. 1961), petitions for rehearing and rehearing *in banc* unanimously denied, cert. granted on the limited issue of the participation of a judge of the Court of Claims, 368 U.S. 814, 82 S.Ct.

with us, along with a companion case, Alexander v. The Glidden Company, after further proceedings in the District Court. The actions grow out of a contract effective for two years from December 1, 1955, between Glidden and a local of the General Warehousemen's Union. (hereafter the Union) representing production, maintenance and service employees at the Elmhurst, L. I., plant of Glidden's Durkee Famous Foods Division. We are invited by Glidden, indeed strongly pressed, to reconsider our decision, 288 F.2d 99, in which we construed this contract as entitling the Elmhurst employees to seniority in opportunity for employment at a new plant at Bethlehem, Pa., to which Glidden transferred a considerable part of the Elmhurst machinery and work when the contract expired. Glidden extends the invitation on the grounds of alleged new law and of new evidence. We must decline it so far as these cases are concerned.

What we previously had before us was a complaint of Olga Zdanok and four other former Elmhurst employees, brought in the Supreme Court of New York for New York County and removed by Glidden, on the basis of diverse citizenship, to the District Court for the Southern District of New York, where Judge Palmieri found against the plaintiffs on the merits. In an opinion by Judge Madden of the Court of Claims with Judge Waterman concurring and Chief Judge Lumbard dissenting, we held that the plaintiffs were entitled by the contract "to be employed at the defendant's Bethlehem plant, with the seniority and reemployment rights which they had acquired at the Elmhurst plant" and to recover the damages caused by Glidden's refusal to recognize that entitlement; we remanded the case to the District Court to determine what these damages were. The Supreme Court's refusal to review our decision save as to the legality of participation therein by a judge of the Court of Claims, 368 U.S. 814, 82 S.Ct. 56, 7 L.Ed.2d 22 (1961), and its approval of such participation, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), left our ruling in effect.

There had also been brought in the Supreme Court for New York County an action against Glidden in which Frank T. Alexander and a large number of other employees at the Elmhurst plant sought relief similar to that asked by the five plaintiffs in the Zdanok action. The Alexander action was not removed; it remained quiescent while the Zdanok case took its way up to the. Supreme Court of the United States. On June 26, 1962, the day after that Court's decision, Alexander et al. filed in the District Court for the Southern District of New York a complaint, alleging diversity of citizenship, substantially identical with that in the Zdanok case. The state court action was discontinued by stipulation. Counsel for both sets of plaintiffs moved for consolidation of the Zdanok and Alexander actions pursuant to F.R.Civ.Proc. 42(a), for summary judgment on the issue of liability under F.R. Civ.Proc. 56, and for an order directing assessment of damages, this to be done before a Special Master under F.R.Civ. Proc. 53. On December 28, 1962, Judge Palmieri granted the motion for consolidation and reserved decision on the remaining items.

After a pre-trial hearing where it was agreed to postpone consideration of the proof of the willingness and ability of individual plaintiffs to work at Bethlehem, of the effect on the rights of certain plaintiffs of discharge, resignation and retirement, and of the damages suffered, the parties proceeded to a trial before Judge Palmieri. Plaintiffs' counsel called two witnesses: Katz, an attorney, presented a survey showing the length of service of the plaintiffs and the rights

56, 7 L.Ed.2d 22 (1961), affirmed on that issue, 370 U.S. 530, 82 S.Ct. 1459, 8 L. Ed.2d 671 (1962), petition for rehearing (including rehearing of the denial of certiorari on the merits) denied, 371 U.S.

854, 83 S.Ct. 14, 9 L.Ed.2d 93 (1962), opinion here under appeal, 216 F.Supp. 476 (S.D.N.Y.1963). Some of the literature provoked by our decision in 288 F.2d 99 is catalogued in footnote 11.

they had or had not attained under Glidden's pension plan when the Elmhurst plant closed. Wiemann, a plaintiff in the Alexander action, the only Elmhurst employee who was later employed at Bethlehem, testified that he was hired there "to work at a reduced rate and start as a new man," after unsuccessful efforts to obtain employment in New York. After Wiemann had been cross-examined, plaintiffs rested, their counsel referring to the pre-trial understanding indicated above. Counsel for Glidden then moved to dismiss, arguing that this court had erroneously assumed the issue of the construction of the contract to be one of state law whereas federal law, held by Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962), to be applicable in such a case, demanded a different result. Judge Palmieri denied the motion, stating it to be his "firm belief * * * that this case should be thoroughly, adequately and finally tried, so that if and when it goes up to an appellate court of [sic] the second time it need not come back to the trial court." He added "It may be that some of the evidence to be received before this Court will prove ultimately to be unnecessary, but I prefer to have a record that is too full than one that is inadequate."

Glidden then called Weeks, its vice president in charge of personnel, who testified to two matters of importance: One was that in 1956 Glidden transferred certain operations then being conducted at Elmhurst to Louisville, Ky.; that approximately 40 Elmhurst employees were laid off as a result; but that no claim was made that any employees were entitled to transfer to Louisville.[2] The other concerned discussions as to the Elmhurst shut-down, including employment opportunities and severance pay, beginning about March, 1957. Weeks testified that, at a meeting in June, Crotty, the Union's representative, "wanted to know if we wouldn't give some kind of seniority" at Bethlehem, but Weeks took the position that this would be something to discuss with the union there. The meeting was followed by a letter of July 9, 1957, in which Hoppman, counsel for the Union, noted that "the Union has formally requested that the Company enter into negotiations pertaining to a severance pay allowance for these employees and has requested the Company to give these employees first option on employment at its new plant in Pennsylvania"; the letter made reference to "the legal rights of the Union to insist upon negotiations with respect to severance pay."[3] Weeks then testified as to a meeting early in August where, after Hoppman and Crotty urged a grant of severance pay which Weeks refused, "Mr. Hoppman also brought up this question of seniority and requested we grant some seniority or preference to employees who might go to Bethlehem. He did not indicate there was any claim under the contract; in fact, he said there wasn't, as Mr. Crotty also told me that there was nothing under the contract that would require us to do it, but he thought we ought to give some consideration to the people who went to Bethlehem." Glidden's other witness, Groves, testified concerning the 1957 discussions to much the same effect as Weeks, whom he had served as assistant. In his testimony as to the August meeting, he went only so far as to say, on the crucial point, that the un-

2. Plaintiffs sought to lessen the force of this by bringing out that some 30 of the 40 employees had enough seniority to transfer to other Elmhurst operations. Glidden countered that 10 of the 40 employees did lose their jobs and that the transfer of the 30 affected the jobs of others who were also covered by the instant contract. No records were produced.

3. Glidden emphasizes the contrast between the assertion as to "legal rights" to insist on negotiations for severance pay, as to which the contract was altogether silent, and the mere request for seniority. Plaintiffs' brief seeks to account for this on the basis that "In light of defendant's refusal to recognize those [seniority] rights, the demand for severance pay, in a form to be agreed upon, represented in actuality a proposal to settle their claim for damages."

ion representatives made no statement "that under the collective-bargaining agreement the employees had any right to go to Bethlehem," but he gave evidence as to a later meeting, not attended by Weeks, where Crotty's assistant, Makowski, "stated that they had been advised by their counsel that they had no right to employment opportunities at Bethlehem or to severance pay but they wished the company to negotiate on these provisions * * *." [4] Glidden also sought to elicit from Groves testimony as to the negotiations for the 1955 contract and for a predecessor of 1953. On objection, the judge admitted evidence only as to the later contract. The testimony was that in the 1955 negotiations Glidden had advised Crotty that the continuing increase in labor costs at Elmhurst threatened the continuance of that operation, whereupon Crotty added to the Union's wage demands one for severance pay, which was refused. An offer of proof with respect to the 1953 negotiations was of the same tenor, alleging additionally a statement by Crotty "that the Union recognized the possibility of shutdown of the Elmhurst plant, transfer of its operations and termination of employees at Elmhurst, and that the Union intended to 'get it while the getting was good.'"

The district judge said in his opinion, 216 F.Supp. at 480, that "On the evidence that was adduced before it, this Court finds that the parties entertained no expectation that the employees' rights would survive the removal of the Elmhurst plant to another state." Believing that "The Court of Appeals, however, has taken a different view on the basis of the contract itself and the implications to be drawn from its terms," he concluded that he was "bound by the Court of Appeals' interpretation notwithstanding the import of the evidence referred to." Noting defendant's "desire to take an immediate appeal from an adverse ruling on the question of liability," he made the certificate specified in 28 U.S.C. § 1292(b); we granted Glidden's timely motion for leave to appeal.

It will be convenient to begin by discussing the Zdanok action which was previously before us, and to consider the Alexander action in the light of the conclusions reached in respect of Zdanok.

## The Zdanok Action

As indicated at the outset, Glidden's contention that we should now reach a different result as to its liability rests both on the testimony offered or sought to be offered through Weeks and Groves (as well as the inference from plaintiffs' failure to contradict the testimony that was admitted) and on new light as to the governing rule of law.

■ We can dispose of the first contention rather readily—the district court had no power to consider the testimony on which Glidden relies. The Zdanok case was tried in 1960 on the issue of liability as fully as the parties wished.[5] Nothing in this court's opinion

4. Plaintiffs placed in evidence the Union's notice of intention to arbitrate, dated October 23, 1957, in which seniority rights at Bethlehem were formally claimed; they did not call Crotty, Hoppman or Makowski.

5. At the outset of the first trial plaintiffs' counsel announced that "in accordance with the suggestion made when this case first appeared on the calendar, we are prepared today to go forward with the reading of a statement which was made by the defendant and received by the plaintiffs in lieu of a deposition before trial, and at the conclusion of the reading of that deposition, to rest except for proof of damages, and at that time it was

my understanding that there would be a motion to dismiss; that your Honor would rule on the question as to whether there was liability on the part of the defendant; that if your Honor held there was liability, we would then go forward before a jury with proof on the question of damage. On the other hand, if your Honor ruled that there was no liability on the part of the defendant, there would be a dismissal of the complaint." Counsel for defendant pronounced this satisfactory. Plaintiffs' counsel proceeded to read a portion of the statement (including a reference to the discontinuance of various operations at Elmhurst and their transfer to Louisville in 1956, of which the District Court's first opinion took

gives the slightest support to any idea that it considered itself to be dealing with an issue but partially tried, in which Glidden possessed evidence helpful to its cause but not yet presented; nor did Glidden's briefs here, or even its petition to the Supreme Court for certiorari, at all suggest this. We ruled "that the plaintiffs were entitled to be employed at the defendant's Bethlehem plant, with the seniority and reemployment rights which they had acquired at the Elmhurst plant" and that "The refusal of the defendant to recognize that entitlement was a breach of contract, and the plaintiffs are entitled to recover the damages which that breach has caused them"; our ruling was not that all this might be so unless defendant came forward with evidence supporting a different reading of the contract. We remanded for the district court to go into the issue which, by agreement, had been left undetermined at the first trial—whether plaintiffs could establish damages from defendant's breach and, if so, how much. Without leave from this court the district court could not lawfully consider further evidence on the issue of liability. In re Potts & Co., 166 U.S.

263, 17 S.Ct. 520, 41 L.Ed. 994 (1897), contrasting In re Sanford Fork & Tool Co., 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414 (1895). So far as the Zdanok action is concerned, we need not discuss plaintiffs' alleged failure to object to the introduction of some of the evidence; the question goes to the power of the district court to receive it. Thornton v. Carter, 109 F.2d 316, 321 (8 Cir. 1940).[6]

Glidden's contention as to a change in the governing law requires more discussion. Its argument can be summed up in three propositions: (1) When the case was previously here, the majority regarded the issue of the construction of the contract as one of New York law; (2) Subsequent decisions of the Supreme Court show that the construction of the contract is determinable by federal law; (3) Under federal law our previous construction was wrong.

We immediately accept the second proposition. Smith v. Evening News Ass'n, supra, 371 U.S. at 199–201, 83 S.Ct. 267, 9 L.Ed.2d 246. As to the first proposition, although, for reasons indicated in the margin,[7] we find no convincing evidence whether the majority

cognizance, supra, 185 F.Supp. 441, 448, fn. 28), and rested. Defendant's counsel then offered the omitted portion; this was received over plaintiffs' objection. Thereupon defendant rested and moved to dismiss. The plan of plaintiffs' going to a jury on the issue of damages "if your Honor held there was liability" on the evidence presented, and Glidden's statement that it rested, are wholly inconsistent with the view that Glidden's motion was addressed only to the evidence presented up to that point, reserving the right to introduce extrinsic evidence on interpretation if the court was not convinced in its favor by what had been submitted. Plaintiffs, of course, were equally precluded from offering further evidence.

6. No different conclusion follows from the consolidation of the Zdanok with the Alexander action. Consolidation "does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." Johnson v. Manhattan Ry., 289 U.S. 479, 496–497, 53 S.Ct. 721, 77

L.Ed. 1331 (1933). If the situation were otherwise, the consolidation order would have to be disregarded as in violation of the mandate.

7. The only explicit statement was by Chief Judge Lumbard who said, in dissent, that "the contract should be construed in light of federal substantive law pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185." The majority's disagreement with Chief Judge Lumbard on the meaning of the contract did not necessarily involve disagreement as to the source of governing law. The briefs cited federal and New York decisions interchangeably; although the majority devoted some discussion to a New York decision, Parker v. Borock, 5 N.Y.2d 156, 182 N.Y.S.2d 577, 156 N.E.2d 297 (1959), that was because it had been heavily relied on by Glidden; and it was not germane to the central issue in any event. Glidden's petition for certiorari (pp. 10–18) claimed that the issue was one of federal law on which this Court's decision was in conflict with those of other circuits, but did not contend that we had

on the previous appeal considered the issue to be "a question of state contract law," 370 U.S. at 537, 82 S.Ct. at 1465, 8 L.Ed.2d 671, we accept Mr. Justice Harlan's statement that they did.[3] We agree with appellant that if, before a case in a district court has proceeded to final judgment, a decision of the Supreme Court demonstrates that a ruling on which the judgment would depend was in error, no principle of "the law of the case" would warrant a failure on our part to correct the ruling.[9] We shall further assume in appellant's favor that this is true in the extraordinary circumstances here, where the Supreme Court, having granted certiorari on a limited issue, expressly affirmed our judgment. 370 U.S. at 585, 82 S.Ct. 1459, 8 L.Ed.2d 671. Compare City of Indianapolis v. Chase Nat'l Bank, 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed.2d 47 (1941).

■■ It is appellant's third proposition that fails. Knowledge that Glidden's contract is to be construed according to federal rather than state law does not mean that the construction previously given by the majority in this court was wrong. Federal law and New York law are alike in that a court's job in interpreting a contract is to ascertain what the parties meant by the words they used. Indeed, "state law, if compatible with the purpose of § 301 [of the Labor-Management Relations Act], may be resorted to in order to find the rule that will best effectuate the federal policy," although any state law so applied "will be absorbed as federal law and will not be an independent source of private rights." Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). The two areas where federal law and New York law on the interpretation of labor contracts might differ would be in greater federal deference to the policy of federal labor statutes or even to "the penumbra of express statutory mandates," ibid., and in the relative weight that courts in one system would give to decisions, not binding upon them, of other courts in the same system as compared with those of courts in the other system.

■■ Glidden seeks to bring itself within both possibilities. It calls attention to decisions under the National Labor Relations Act that an advance agreement to give recognition at a contemplated new location to a union representing a majority of the employees at an existing location may constitute an unfair labor practice. Chicago Freight Car & Parts Co., 83 N.L.R.B. 1163 (1949); N. L. R. B. v. Masters-Lake Success, Inc., 287 F.2d 35 (2 Cir. 1961), enforcing 124 N.L.R.B. 580 (1959). But these decisions, resting on the agreement's unlawful interference in the selection of a bargaining representative, do not say that a contract whereby an employer undertook to recognize existing seniority in hiring

considered the issue to be one of state law. That view seems to have originated in respondents' brief opposing the petition, p. 9; the theory was that since Zdanok was an action to · sustain individual rights of employees, the decision in Association of Westinghouse Employees v. Westinghouse Elec. Corp., 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510 (1955), which the Supreme Court had not yet formally repudiated, called for application of state law.

8. The statement was not material to the question before the Supreme Court; the issue as to the legality of Judge Madden's participation would have been precisely the same if his opinion had plainly said that the construction of the contract was to be determined by federal law.

9. The reason, as stated in White v. Higgins, 116 F.2d 312, 317 (1 Cir. 1940), is that "Our [a court of appeals'] law of the case is not the Supreme Court's law of the case. Our judgment on the second appeal stands or falls on its merits and has no improved standing before the Supreme Court from the fact that it resulted from an application of our law of the case." The latter statement finds support in Panama R.R. v. Napier Shipping Co., 166 U.S. 280, 283–284, 17 S.Ct. 572, 41 L.Ed. 1004 (1897); Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912); and Reece v. Georgia, 350 U.S. 85, 87, 76 S.Ct. 167, 100 L.Ed. 77 (1955). See also Peterson v. John Hancock Mut. Life Ins. Co., 116 F.2d 148 (8 Cir. 1940).

at a new plant would constitute an unfair labor practice, or that an employer who had so contracted would commit an infraction by refusing to violate his commitment in a bargain with the duly chosen representative at the new location. As to federal decisions, in addition to citing the same cases on which it relied three years ago, System Federation No. 59 v. Louisiana & A. Ry., 119 F.2d 509 (5 Cir.), cert. denied 314 U.S. 656, 62 S.Ct. 108, 86 L.Ed. 526 (1941); Elder v. New York Central R. R., 152 F.2d 361 (6 Cir. 1945); and Local Lodge No. 2040, I. A. M. v. Servel, Inc., 268 F.2d 692 (7 Cir.), cert. denied, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959), which are distinguishable, Glidden stresses Oddie v. Ross Gear and Tool Co., 305 F.2d 143 (6 Cir.), cert. denied, 371 U.S. 941, 83 S.Ct. 318, 9 L.Ed.2d 275 (1962), which is not fairly so despite the Sixth Circuit's politeness in calling Glidden's agreement "materially different." 305 F.2d at 149. But this single decision by a sister court

of appeals scarcely creates a *corpus* of federal law showing our previous ruling to be erroneous.[10] What the Oddie ruling does create, particularly when it is superimposed on Chief Judge Lumbard's earlier dissent here and the great amount of critical discussion in the law reviews that our decision has engendered,[11] is doubt whether, if other similar contracts should come before us for construction, we ought follow the lead of our divided decision in this case or of the unanimous contrary one of the Sixth Circuit in Oddie. This is precisely the situation in which "the law of the case" is decisive; in Judge Magruder's words, "mere doubt on our part is not enough to open up the point for full reconsideration." White v. Higgins, 116 F.2d 312, 317 (1. Cir. 1940).

 It is true enough that, as said by Judge Learned Hand, "the 'law of the case' does not rigidly bind a court to its former decisions, but is only addressed to its good sense." Higgins v.

---

10. The Supreme Court's expressed belief that our ruling rested on state law deprives the denial of certiorari in Oddie of whatever small significance it might otherwise have had. Supreme Court Rule 19, subd. 1(b).

11. The following is a partial listing of these comments, some favorable and others unfavorable:

*Articles:*

Aaron, Reflections on the Legal Nature and Enforceability of Seniority Rights, 75 Harv.L.Rev. 1532 (1962);

Blumrosen, Seniority Rights and Industrial Change: Zdanok v. Glidden Co., 47 Minn.L.Rev. 505 (1962);

Burstein, Subcontracting and Plant Removals, 13 Lab.L.J. 405 (1962);

Daykin, Runaway Shops: The Problem and Treatment, 12 Lab.L.J. 1025 (1961);

Feinberg, Do Contract Rights Vest? Proceedings of the Sixteenth Annual Meeting, National Acad. of Arbitrators 192 (1963);

Lowden, Jr., Survival of Seniority Rights Under Collective Agreements: Zdanok v. Glidden Co., 48 Va.L.Rev. 291 (1962);

Turner, Plant Removals and Related Problems, 13 Lab.L.J. 907 (1962).

*Notes:*

Seniority Rights Held to Survive Termination of Collective Bargaining Agreement and Relocation of Plant, 61 Colum.L.Rev. 1363 (1961);

Plant Removal and the Survival of Seniority Rights: The Glidden Case, 37 Ind.L.J. 380 (1962);

Industrial Mobility and Survival of Seniority—What Price Security?, 36 So.Cal.L.Rev. 269 (1963);

Seniority Rights Survive the Termination of the Collective Bargaining Agreement, 40 Texas L.Rev. 721 (1962);

Seniority Survival: A New Doctrine of Uncertain Prospects, 9 U.C.L.A.L. Rev. 469 (1962);

Seniority Rights Held to Survive Termination of Contract and to be Transferable to Employer's New Plant, 110 U. Pa.L.Rev. 458 (1962);

Seniority—Whether Rights Survive the Collective Bargaining Agreement, 1962 Wis.L.Rev. 520.

*Panel Discussions:*

Plant Removals and Related Problems, 13 Lab.L.J. 914 (1962);

Employer's Right to Relocate vis-a-vis Labor, 19 N.Y.County Bar Bull. 145. (1962);

Plant Removals and Subcontracting of Work, 14 Lab.L.J. 366 (1963).

California Prune & Apricot Grower, Inc., 3 F.2d 896, 898 (2 Cir. 1924). It is true also that one of the bases for the principle, the desire to save judicial time, is not too persuasive when, as here, an overruling of our previous decision might well bring "the case" to a much quicker end than it will otherwise have, and it seems not unlikely that we may be required to face the same issue with respect to some other contract of similar ambiguity. But another consideration is applicable: where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again. Perhaps the "good sense" of which Judge Hand spoke comes down to a calculus of the relative unseemliness of a court's altering a legal ruling as to the same litigants, with the danger that this may reflect only a change in the membership of the tribunal, and of its applying one rule to one pair of litigants but a different one to another pair identically situated. This explains why a clear conviction of error on a point of law that is certain to recur, as in this court's well-known decision in Johnson v. Cadillac Motor Car Co., 261 F. 878, 886, 8 A.L.R. 1023 (2 Cir. 1919),[12] will prevail over "the law of the case" whereas "mere doubt" will not. In the former instance the court knows that later litigants will be governed by a different rule; in the latter that is only a possibility. We hold Zdanok to be governed by our previous decision.

### The Alexander Action

Despite the difference in parties plaintiff, we would entertain no doubt that the construction of the contract announced in the appeal in the Zdanok action, to which we adhere in that action, ought be applied in the Alexander action also, if "the case" remained the same in other respects. Since the doctrine of the law of the case is addressed to the court's "good sense," we see no reason why it should be peremptorily excluded because of the presence of new parties when the party against whom it is invoked was fully heard on a prior appeal, any more than that it must be rigidly applied whenever the parties remain the same. The construction of a contract has long been recognized as the type of issue "that is particularly vulnerable to law of the case." Note, Law of the Case, 5 Stanford L.Rev. 751, 759 (1953), citing Leese v. Clark, 20 Cal. 387, 418 (1862). Glidden was given the opportunity to make its argument on the construction of the contract and took full advantage of it. While the Alexander plaintiffs were not parties to the Zdanok action, it is clear that everyone expected their rights to be governed by the court's interpretation of the contract in that test case.[13] Thus for the purpose of holding Glidden to the law of *its* case, we would see no unfairness in proceeding as if the Alexander plaintiffs had been parties to an action which was expected to settle their rights—again assuming that "the case" was still the same.

This brings us to Glidden's argument that because of the additional evidence, which, it urges, was surely received with propriety in the Alexander action, the latter was not the same "case" as that on which we previously ruled.

The new testimony does not have the strong impact upon a majority of us that it did upon the district judge. The evidence with respect to the transfer of certain Elmhurst operations to Louisville in 1956 was not carried through to the point where it would be truly convincing, see fn. 2; indeed, plaintiffs argue with some force that Glidden's failure to produce its

12. See Cardozo, The Nature of the Judicial Process 158–60 (1921 ed.); 1A Moore, Federal Practice ¶0.404[2] (1961).

13. At the close of the trial before Judge Palmieri in May, 1960, plaintiffs' counsel remarked, "I think this case is indeed an important one. * * * This case is a test case affecting five employees but actually affecting 160-odd employees of this plant."

records on this subject warrants the inference that the claim was not supportable. When the testimony as to the admission in 1957 that the seniority provisions did not cover the move to Bethlehem is read as a whole, we get the impression that this primarily reflected the legal views of the Union's lawyer. This is not very probative since there is no evidence that he had particular knowledge of the background of the contract—indeed, the record shows that he did not participate in the negotiations of either 1955 or 1953. The Union's repeated unsuccessful demands for severance pay do not lead to the inference of its consciousness of the limited effect of the seniority clauses with anything like the inevitability that Glidden contends. Severance pay, available to all the Elmhurst employees, was a quite different and much more attractive proposition to the Union than seniority rights that would help only those employees who would be willing to move their lares and penates to a destination which in 1953 and 1955 was not even known. The Union thus might perfectly well have sought severance pay in 1953 and 1955 even though it believed the contract protected seniority rights on a transfer, and surely might have preferred a settlement on that basis in 1957 to what it then knew would be a controversy on that subject. Still, with the issue of construction of the contract such a close one, we cannot be sure that the evidence now offered by Glidden and the inference from plaintiffs' failure to rebut it might not have tipped the scales on the prior appeal or be decisive in this one if properly before us. But we hold that in the Alexander action also the new evidence should not be considered.

The reason for this lies in the principle somewhat undescriptively called "collateral estoppel"; we hold that the ruling of liability in the Zdanok case precluded Glidden from offering new evidence to contest this not only against the five original plaintiffs but against the Alexander group as well. We recognize that such a holding would have seemed impossible fifty years ago: If in the Zdanok action the contract were construed as Glidden contends, this would not preclude the Alexander plaintiffs from offering extrinsic evidence to support their construction of the contract, since they had not had their day in court. Because it was thought that estoppels must be "mutual," that "Nobody can take benefit by a verdict, who had not been prejudiced by it, had it gone contrary," [14] Glidden would likewise not be precluded from offering new evidence against the Alexander group.

This doctrine of the need for mutuality of estoppels, criticized by Bentham over a century ago as destitute of any semblance of reason, and as "a maxim which one would suppose to have found its way from the gaming-table to the bench," ibid. fn. 14, has been much eroded in recent years. Perhaps the leading federal decision is Judge Hastie's in Bruszewski v. United States, 181 F.2d 419 (3 Cir.), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950), which this court followed in Adriaanse v. United States, 184 F.2d 968 (2 Cir. 1950), cert. denied 340 U.S. 932, 71 S.Ct. 495, 95 L.Ed. 673 (1951). We see no purpose in multiplying citations since it is recognized that the widest breach in the citadel of mutuality was rammed by Justice Traynor's opinion in Bernhard v. Bank of America, 19 Cal.2d 807, 811–813, 122 P.2d 892, 894–895 (Calif.1942).[15] Having explained why "The criteria for determining who may assert a plea of res judicata

14. Bentham, Rationale of Judicial Evidence, in 7 Works of Jeremy Bentham 171 (Bowring ed. 1843), quoted in Currie, Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine, 9 Stan. L.Rev. 281, 284 fn. 6 (1957).

15. On its facts the Bernhard case would seem to have come within a long recognized exception to the requirement of privity—namely, that a judgment in favor of an indemnitor precludes a later action against an indemnitee. American Law Institute, Restatement of Judgments, § 96(a); Good Health Dairy v. Emery, 275 N.Y. 14, 9 N.E.2d 758, 112 A.L.R. 401 (1937); Currie, supra, 9 Stan.L.Rev. 290 fn. 22.

differ fundamentally from the criteria for determining against whom a plea of res judicata may be asserted," and that there is "no compelling reason * * * for requiring that the party asserting the plea of res judicata must have been a party, or in privity with a party, to the earlier litigation," he said:

"In determining the validity of a plea of res judicata three questions are pertinent: 'Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?"

The statement of the second of these criteria suggests an obstacle to the Alexander plaintiffs' invoking the ruling as to liability in Zdanok, namely, that there has yet been no final judgment on the merits in that case. But we see no reason why in an appropriate case a ruling that is final on the issue of liability should not preclude the party against whom the decision ran from presenting further evidence on the issue there finally determined. Dealing with this very question of the kind of finality of judgment necessary to create an estoppel, we pointed out, quite recently, that collateral estoppel does not require a judgment "which ends the litigation * * * and leaves nothing for the court to do but execute the judgment," Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945), but includes many dispositions which, though not final in that sense, have nevertheless been fully litigated. Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2 Cir. 1961), cert. denied, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962), and cases cited. As we there said, " 'Finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." We meant our previous ruling to be final on the hotly contested issue of liability under Glidden's contract with its employees, the Supreme Court affirmed this, and we have now affirmed it again. The mere fact that the damages of the Zdanok plaintiffs have not yet been assessed should not deprive that ruling of any effect as collateral estoppel it would otherwise have. It was simply a matter of procedural convenience that caused the district court to consolidate the Zdanok and Alexander actions, rather than allow the Zdanok action to go first to the final judgment to which, in the absence of Supreme Court review, it now shortly must.

A more serious question is whether the Bernhard criteria should be applied so generally in favor of persons not parties or privies to the earlier judgment as that opinion stated. A penetrating article by Professor Brainerd Currie, cited in fn. 14, while heartily approving what had been decided in Bernhard and most of what was said there, suggested the opinion had stated the principle too broadly. He distinguishes between a stranger's "defensive" use of a prior judgment, which he thinks proper regardless of mutuality, and "offensive" use, which he thinks generally improper in the absence of mutuality. The evils of such "offensive" use are illustrated by the case of a railroad accident injuring 50 people who bring separate successive actions. The railroad can achieve no benefit in future actions from successful defense of the first 20. Yet, under the letter of the Bernhard opinion, a loss in the 21st round, perhaps resulting from a jury compromise out of sympathy for an appealing plaintiff, would bind the railroad for the remaining 29. Currie's understandable belief that something was wrong in that picture proved persuasive to a district court of appeal in California which, citing his article, refused to allow other persons injured in an automobile collision to avail themselves of a prior plaintiff's judgment, Nevarov v. Caldwell, 161 Cal.App.2d 762, 327 P.2d 111 (1958), and the California Supreme Court denied hearing, Justice Carter alone dissenting, 327 P.2d at 122.

New York also takes this view. Elder v. New York & P. Motor Express, Inc., 284 N.Y. 350, 31 N.E.2d 188, 133 A.L.R. 176 (1940). Contrast United States v. United Air Lines, Inc., 216 F.Supp. 709, 725 (D.Nev.1962) [judgment against airline in consolidated cases of 24 plaintiffs after 15 week trial held conclusive—but airline indicated it had no additional evidence].

■ We find the instant case to be fairly distinguishable from the California and New York decisions just cited and to warrant application of the Bernhard principle. Professor Currie recognizes that his "offensive-defensive" distinction is simply a rule of thumb that will usually achieve the right result, and concludes, supra, 9 Stan.L.Rev. at 308, that the abandonment of the mutuality requirement is sound except (1) "where the result would be to create an anomaly such as would occur in the railroad type of situation, where the party against whom the plea is asserted faces more than two successive actions," or (2) where "by reason of his former adversary's possession of the initiative," he has not "had a full and fair opportunity to litigate the issue effectively." Here Glidden's opportunity to litigate the Zdanok case was both full and fair. New York was an entirely reasonable forum for litigation of a contract made in New York with respect to residents of New York working in a New York plant; as between state and federal courts in New York, Glidden, in the Zdanok case, had the forum of its choice. Although the plaintiffs are numerous, and could conceivably, by careful timing of their complaints, have subjected Glidden to such a series of actions as posed in Professor Currie's railroad case, such a course offers little advantage where the matter in issue is not a factual question of negligence subject to the varying appraisals of the facts by different juries, but the construction of a written contract by a judge. Needless to say, nothing in the result of Zdanok turned on personal sympathy or any other consideration relating specifically to those five plaintiffs as distinguished from the other employees. And Glidden cannot reasonably argue that it was unfairly surprised by the entry of the Alexander plaintiffs into the lists after judgment in Zdanok or that it would have defended more diligently if the two actions had been combined from the outset. The Zdanok litigation was prosecuted by Glidden with the utmost vigor, up to the Supreme Court of the United States. The Alexander action in the state court was known by everyone to be lurking in the wings; it was mentioned in Glidden's brief in this court, p. 2, in its petition for rehearing, p. 3, and in its petition for certiorari, p. 4. Since both the Zdanok and Alexander actions present questions of federal law, we are free to follow our own conceptions as to the effect of the judgment in the former on the latter, see Currie, supra, 9 Stan.L.Rev. at 301, fn. 40, and need not decide whether this would also be true if federal jurisdiction in either or both actions rested on diversity alone. Cf. Kern v. Hettinger, 303 F.2d 333, 340 (2 Cir. 1962).

■ All that remains is Glidden's contention that the plaintiffs made no objection to the receipt of the evidence as to the refinery shut-down or the 1957 discussions and objected to the evidence of the negotiations, so far as concerned the Alexander case, only on the ground of materiality. Whatever importance this might have if the party that had failed to object were complaining of the decision, F.R.Civ.Proc. 46, it has none when the attack is by the other party. "In the review of judicial proceedings the rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937); see 7 Moore, Federal Practice § 72.05 (1955). Beyond that, plaintiffs' motion for summary judgment on the issue of liability had already made "known to the court" their position that further evidence on that issue could not properly be taken; in that sense defend-

ant's entire evidentiary presentation was over plaintiffs' objection.

The interlocutory judgment denying defendant's motion to dismiss the complaint, granting plaintiff's motion for judgment on the issue of liability, and directing the ascertainment of damages is affirmed.

LUMBARD, Chief Judge (concurring).

I concur in affirmance of the interlocutory judgment of the district court.

Although the record is not very clear, it seems fair to conclude that at the first trial of the Zdanok action before the district court the defendant had full opportunity to introduce evidence relating to the contractual intent of the parties. The defendant having elected not to do so, the mandate of this court on the original appeal foreclosed for the district court the issue of liability. Inasmuch as the district court was without power to receive additional evidence relating to the issue of liability, and in light of the fact that absent such new evidence the case returns to us in virtually the same posture as at the time of our prior decision, I feel constrained to acquiesce in the application of the law of the case doctrine.

Were it not the case that the Alexander action had been instituted in the New York State Supreme Court some two years before the brief trial of the Zdanok action, I should be reluctant to concur in the extension of the collateral estoppel doctrine to encompass the circumstances in Alexander. But it is clear that when the defendant elected to rest its case primarily on the terms of the collective bargaining agreement in Zdanok —a case involving merely five employees —it was fully aware of the Alexander case, then pending in the state court for about two years, which involved some 160 employee-plaintiffs. Were the cir-

cumstances otherwise, I might be persuaded by a claim that the defendant failed to produce the totality of its relevant evidence in Zdanok because of the limited recovery which could have been anticipated upon a judgment for only five plaintiffs. But such a position is untenable in the circumstances here.

I should like to point out that, while the law of these specific cases is settled, and with all respect to Judge Madden, a distinguished senior judge of the Court of Claims, the prior decision rendered by this court, 288 F.2d 99 (1961), in fact represents the views of but one judge of this circuit and is entitled to no precedential value so far as this circuit is concerned. The two judges of this circuit who heard the first appeal were divided on the appropriate disposition of the case.

As for the merits of these cases, whatever substance there may have been in the plaintiffs' position on the first appeal, had it been proper for the district court to consider the additional proof adduced by the defendant at the second trial it seems to me to be clear beyond the peradventure of a doubt that the defendant proffered the only tenable view of the collective bargaining agreement. As Judge Palmieri stated: "This Court finds that the parties entertained no expectation that the employees' rights would survive the removal of the Elmhurst plant to another state." It is not for the courts to alter the bargain which the parties themselves have struck.

Thus, unfortunately, the result of this litigation is completely at variance with the intention of the parties. Nonetheless, in light of the sound basis in reason and policy for declining to permit the defendant to introduce now evidence which it could have brought before the district court at the first trial, I reluctantly concur in affirmance of the judgment below.