UNITED STATES COURT OF APPEALS
**FOR THE SECOND CIRCUIT**

August Term, 2017

(Argued: November 8, 2017          Decided:  August 15, 2018)

Docket No. 16-3650

_____

Amy Colvin,

*Plaintiff-Appellant*,

v.

Hubert Keen, President, in his official and individual capacity, Lucia Cepriano, Vice-President, in her official and individual capacity, Marybeth Incandela, Director, in her official and individual capacity, James Hall, in his official and individual capacity,

*Defendants-Appellees.*

_____

Before:

PIERRE N. LEVAL, DEBRA ANN LIVINGSTON, and DENNY CHIN,
*Circuit Judges*.

The plaintiff, a former employee of the State University of New York at Farmingdale, appeals from the grant of summary judgment by the United States District Court for the Eastern District of New York (Sandra J. Feuerstein, *J*.) dismissing her claim that officers and employees of the university retaliated against her for her speech in violation of the First Amendment. We find that the district court's reversal of its prior denial of summary judgment did not offend the principle of law of the case. The judgment is AFFIRMED by reason of the defendants' qualified immunity.

JAMES M. MALONEY, Law Office of James M. Maloney, Port Washington, N.Y., *for Plaintiff-Appellant*.

MARK H. SHAWHAN, (Anisha S. Dasgupta, *on the brief*), *for* Barbara D. Underwood, Attorney General State of New York, New York, N.Y., *for Defendants-Appellees*.

LEVAL, *Circuit Judge*:

Plaintiff Amy Colvin appeals from the grant of summary judgment by the United States District Court for the Eastern District of New York (Sandra J. Feuerstein, *J*.), in favor of the defendants, Hubert Keen, Lucia Cepriano, Marybeth Incandela, and James Hall ("Defendants"), in their individual and official capacities as officers and employees of the Farmingdale State College of State University of New York ("SUNY Farmingdale" or the "College"). Colvin, who was employed by the College as an admissions counselor during the relevant time, alleged that Defendants took adverse employment action against her in violation of the First Amendment in retaliation for her giving advice to a co-worker who was being arrested by campus police. The district court initially denied Defendants' motion for summary judgment and instructed that the case proceed to trial. On receipt of additional briefing, the

district court ruled that the First Amendment did not protect Colvin from retaliation because her speech did not address a matter of public concern, and dismissed the case. Colvin contends that, under the doctrine of *law of the case* ("LOTC"), we should require the district court to adhere to its original ruling and conduct a trial. We disagree. Without deciding whether the district court's ultimate conclusion as to the character of Plaintiff's speech was correct, we affirm the grant of summary judgment to Defendants on the alternate ground of Defendants' qualified immunity.

## BACKGROUND

The evidence, if considered in the light most favorable to Plaintiff, showed the following. On May 18, 2011, Plaintiff, who was employed by the College as an admissions counselor, participated in a lunchtime yoga class in a campus classroom. During the session, campus police officers entered the class in order to arrest Sherry Buch, a College employee who had been suspended but was participating in the class. The police were responding to a report that Buch was trespassing on the campus. Colvin identified herself as an attorney and said to the police, "Officers, I would like to get her . . . union representation and an attorney." App'x 215. Colvin accompanied the officers

as they directed Buch to a vestibule outside the yoga classroom. She told Buch, "[W]e're going to work on getting you a lawyer and a union rep," *id.*, and advised her "to wait to say anything until we got an attorney and a union rep," *Id.* at 218. Colvin also told the officers that she "would like to accompany [Buch] to the police station." *Id.* at 216. The officers responded, "Well, we're going to arrest you now," to which Colvin replied, "I believe that would be a false arrest." *Id.* at 215. The officers did not arrest Colvin.

On June 14, 2011, Defendant Marybeth Incandela, the SUNY Farmingdale Director of Human Resources, questioned Colvin about the incident and on June 27, 2011, gave Colvin a counseling memorandum. The memorandum recapitulated that Colvin had "identified [her]self as an attorney and offered advice and guidance to the employee being arrested." App'x 228. It described Colvin's actions as "escalating tension," criticized her for making "the assumption that the officers were acting improperly," and informed her that "interfering with police business is unprofessional." *Id*. It advised Colvin that, "Going forward, it is expected that your personal conduct will be professional, and you will not interfere with any police business conducted on the Farmingdale State College campus." *Id*.

4

On July 8, 2011, Defendant James Hall, Colvin's supervisor, recommended her for reappointment. On July 21, 2011, however, Defendant Lucia Cepriano, a Vice-President, advised that Colvin not be reappointed. Four days later, on July 25, 2011, Hall met with Colvin and counseled her about union activities. On August 2, 2011, Defendant Hubert Keen, President of the College, advised Colvin by letter that her contract would not be renewed. Colvin continued to be employed at the College for approximately two more years. At some point between February 27, 2013 and August 6, 2013, her employment was terminated.

Colvin asserts that her job performance was "stellar," App'x 272, pointing to achievement forms, letters from management employees, students and parents, and informal evaluations in her personnel file, as well as discretionary bonuses, raises, and positive feedback she received from her supervisors.

## **Procedure**

Colvin brought this action on June 25, 2013 asserting a claim of retaliation for First Amendment protected speech under 42 U.S.C. § 1983,

among other claims. She alleges that her contract was terminated because she "spoke up for someone's [constitutional] rights." Colvin sought *inter alia* compensatory and punitive damages, reinstatement of her job, and an injunction against future adverse employment actions.

The district court dismissed most of Colvin's claims with prejudice for either lack of subject matter jurisdiction or failure to state a claim. The court ruled that, considering the passage of two years between the yoga class incident and her ultimate termination, Colvin had not shown a causal connection between the two. The court accordingly dismissed her First Amendment retaliation claim to the extent it was based on her claim that her 2013 termination was in retaliation for her exercise of free speech at the 2011 yoga class. Colvin has not challenged that ruling in this appeal.

To the extent Colvin's First Amendment claim was based on the counseling and reproaches she received in 2011, the claim was not dismissed. Defendants moved for summary judgment on June 5, 2015, arguing that Colvin's claim must fail under the doctrine of *Pickering v. Board of Education*, 391 U.S. 563 (1968), because her speech was not on a matter of public concern and thus was not protected from retaliation by the First Amendment. The

district court referred the motion to United States Magistrate Judge Arlene R. Lindsay for report and recommendation. The Magistrate Judge recommended that the motion be denied with respect to the First Amendment retaliation claim, reasoning that Colvin's speech at the Yoga Incident did address a matter of public concern because she "was not speaking of a personal grievance; rather, she [was] attempting to vindicate Ms. Buch's constitutional right to counsel and her right to union representation in the face of perceived police misconduct." App'x 132. The district court at first was persuaded by the Magistrate Judge's recommendation. By order dated January 19, 2016, it denied summary judgment and instructed that the case proceed to trial.

Shortly before the trial was scheduled to begin, Defendants submitted a trial brief ("Pretrial Memorandum of Law"), in which Defendants argued once again that Plaintiff's speech was not on a matter of public concern, but was motivated to help Buch achieve a favorable disposition of her arrest. The court invited Plaintiff to respond, indicating a readiness to reconsider whether summary judgment should be granted. Plaintiff responded, along with an argument on the merits, that it was "Law of the Case as per the Court's Opinion and Order dated November 30, 2015 . . . that Plaintiff's

speech was a matter of public concern," and that the court was therefore obligated to adhere to the earlier ruling. Pl. Opp., ECF 107 at *2 (Sept. 13, 2016) E.D.N.Y 2:13-cv-3595 (SJF). The district court was persuaded by Defendants' new briefing, which it characterized as a motion under Rule 54(b) for reconsideration. By order dated September 28, 2016, it granted summary judgment on all remaining claims in favor of Defendants. Colvin then brought this appeal.

## DISCUSSION

### I.    Law of the Case

Colvin's first contention is that, under the doctrine known as *law of the case* ("LOTC"), because the district court initially entered an order denying Defendants' motion for summary judgment before changing its mind, we should vacate the district court's ultimate grant of summary judgment and require it to adhere to its initial denial.[1] Colvin does not point to any

---

[1] The phrase, *law of the case*, is used in several different circumstances. One circumstance is when a court considers changing a ruling it had previously made in the same case. A second arises when an appellate court is asked to overturn a lower court's decision because the lower court departed from a ruling it had previously made in the case. A third arises when a lower court considers whether to adhere to a ruling previously made by a higher court in the same case. In each circumstance, LOTC functions differently and involves considerations that do not necessarily bear on the others. In this case we consider the circumstance in which an appellate court is asked to reverse the judgment of the trial court because the trial court changed a ruling previously made in the case. What we say in this context does not necessarily bear on the application of the doctrine in the other very different circumstances.

prejudice she suffered by reason of the change of ruling. She acknowledges, furthermore, that LOTC is not a rule that bars courts from reconsidering prior rulings, but is rather "a discretionary rule of practice [that] generally does not limit a court's power to reconsider an issue." Appellant Br. 17 (quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991)). As characterized by Judges L. Hand and Friendly, the doctrine "'does not rigidly bind a court to its former decisions, but is only addressed to its good sense.'" *Zdanok v. Glidden Co.*, 327 F.2d 944, 952-53 (2d Cir. 1964) (Friendly, *J.*) (quoting *Higgins v. California Prune & Apricot Grower, Inc.*, 3 F.2d 896, 898 (2d Cir. 1924) (L. Hand, *J.*)). *See also*, *Arizona v. California*, 460 U.S. 605, 644 (1983) (Brennan, *J.*, concurring in part and dissenting in part) ("A court's decision to reconsider a prior ruling before the case becomes final . . . is ultimately a matter of good sense.") (internal quotation marks omitted); *Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, *J.*) ("In the absence of statute the phrase, 'law of the case' . . . merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power."). In short, Colvin asks us to vacate the grant of summary judgment and order trial, notwithstanding that she suffered no harm or prejudice from the change of ruling and regardless of

whether the final ruling was right or wrong, solely because the district court initially denied the motion before becoming convinced that the motion should be granted. We reject that argument.

    a. Appellate Review of a District Court's Changed Rulings

In asking that we vacate the grant of judgment under LOTC solely because the district court had earlier denied summary judgment, without pointing to any prejudice she suffered or any other special circumstances that might render the change of ruling problematic, Colvin misunderstands the nature of the doctrine. LOTC does not assert, as a general proposition, that it is bad for courts to correct their mistakes, much less that doing so will result in reversal. If that were the meaning of LOTC, it would be a foolish rule. In all forms of human endeavor, people make mistakes, and in most circumstances the best course of action is to correct them. Judging is no different. Nonetheless, in some circumstances, problems that might result from changing a ruling outweigh the benefits of correcting an error, or at least of doing so without taking steps to mitigate the resulting problems. LOTC does not say to judges, "Once a ruling has been made, you should not change it." It says rather, "When deciding whether to change a ruling, you should consider

whether making the change will cause problems that would make it preferable to adhere to the earlier ruling (even though you now consider it erroneous) or would at least make it advisable to take precautious measures to mitigate the bad effects of those problems."

The issue can arise in innumerable contexts. We consider a few hypotheticals that illustrate the considerations that affect application of LOTC. Suppose that at the start of a trial, the plaintiff's counsel put a question to the plaintiff, opening a line of inquiry, and the trial judge initially sustained the defendant's objection to the question on the grounds of the irrelevance of that line of inquiry. Moments later, the court reconsidered and proposed to allow the question to be answered. The defendant objected based on LOTC, but the court allowed the plaintiff to answer. Following a verdict for the plaintiff, the defendant argued on appeal that the judgment should be set aside solely because, under LOTC, the court should not have changed its initial ruling. Absent a showing that the ultimate ruling was error, or that the change caused prejudice to the defendant or resulted in some other harm, we see no reason why the trial judge should have adhered to the erroneous previous ruling merely because of the undesirability of changing rulings. We

see even less reason why the appellate court would require a new trial, especially because, at the new trial, the judge would once again allow the inquiry into the subject matter.

On the other hand, suppose that at the start of trial, just as in the previous example, the court sustained the defendant's objection to the plaintiff's counsel's question on the grounds of the irrelevance of the inquiry. However, just before the close of trial, the court reconsidered, decided that the line of inquiry was relevant, and proposed to now allow the plaintiff to answer the question. The defendant objected based on LOTC and argued that he was prejudiced because, in reliance on the court's initial ruling that the line of inquiry was irrelevant, the defendant had released its subpoenaed witnesses, whom he would have called to rebut the plaintiff's answer to the question. In that circumstance, the trial judge would have strong reasons either to adhere to the prior ruling, or to explore whether grant of a continuance could cure the prejudice suffered by the defendant. If the trial court simply changed its ruling in spite of the prejudice to the defendant, and without taking curative measures, an appellate court might have good reason to vacate a judgment in the plaintiff's favor.

Given that under LOTC the question whether to change a ruling is addressed to the court's discretion, the trial court's discretion to make the change is reviewed on an abuse of discretion standard. The most common problem that would justify the appellate court in finding that the trial court abused its direction in making a change of ruling would be that doing so caused prejudice to the appellant.

In *Prisco v. A & D Carting Corp.*, the district court initially ruled, on cross-motions for summary judgment, that the plaintiff had satisfied the elements of a *prima facie* claim because the defendants were "potentially responsible parties" within the meaning of the statute sued under. 168 F.3d 593, 604 (2d Cir. 1999). Following a bench trial, and without notice to the plaintiff, the court reversed its prior ruling and dismissed the claim on the basis that the plaintiff "had failed to prove that any of the defendants were potentially responsible parties within the meaning of [the statute]." *Id*. While we found on appeal that the district court's final judgment was not "clear error," *id*. at 606, and that the court had changed its ruling for the "obviously valid reason" of correcting an error of law, *id.* at 607, we nonetheless asserted that revisiting the ruling without notice to the plaintiff had "raise[d] the

specter of severe prejudice to [the plaintiff] if it deprived her of the opportunity to prepare and present evidence on that issue at trial." *Id*. We explained that LOTC is "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Id.* Hence, we contemplated that, if the change of ruling had prejudiced the plaintiff, LOTC would have counseled the district court to maintain its initial, incorrect, ruling despite the likelihood of reversal.[2]

As the Wright & Miller treatise observes, "if a sound reason for reconsideration could be found, law-of-the-case concerns should require only that reliance on the first ruling be protected, not that reconsideration be prohibited." Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478.1, n.10 (2d ed. 2018) (commenting on *Marfia v. T.C. Ziraat Bankasi*, 100 F.3d 243 (2d Cir. 1996)). *See also*, *United States v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982) ("The only limitation placed upon a trial judge's decision to disregard a previous ruling . . . is that prejudice not ensue to the party seeking the benefit of the doctrine. In this context prejudice . . . refers to a lack of sufficiency of notice

---

[2] We concluded that, despite a lack of notice to the plaintiff, the change of ruling had not in fact caused prejudice and, accordingly, we affirmed. *Prisco*, 168 F.3d at 607.

and an opportunity to prepare armed with the knowledge" that the prior ruling does not control.) (internal citations omitted).

Consider another illustrative hypothetical example: a court initially denied a motion to dismiss the complaint by reason of its failure to state a claim upon which relief may be granted. Soon thereafter, the court recognized that, contrary to its earlier assessment, the complaint was insufficient; the court reconsidered the prior denial and dismissed the case. No good reason appears why the appeals court should not judge the appeal exactly as if the ultimate ruling had been entered in the first instance, without change, unless the plaintiff suffered prejudice caused by the change. Assuming the appellate court considering the ultimate ruling deemed it to have been correct, it would make no sense to vacate the dismissal and compel the parties to continue litigating a complaint that fails to state an actionable claim. Our court so ruled in *Quinn v. Aetna Life & Casualty Company*, 616 F.2d 38 (2d Cir. 1980).[3] In *Quinn*, the defendant's motion to dismiss on the pleadings was initially denied and then subsequently granted. *Id.* at 40. We affirmed the dismissal,

---

[3] The fact pattern in *Quinn* differed slightly from the illustrative hypothetical because the initial ruling upholding the complaint was in state court. Following the ruling, the case was removed to federal court, which granted the motion to dismiss. That difference is without significance to our discussion of LOTC. The change caused no prejudice to the plaintiff, and our court reasoned that LOTC erected no bar to either the district court's changed ruling or our affirmance of it. *Quinn*, 616 F.2d at 40-41.

explaining that "[r]elitigation of Aetna's motion for dismissal on the pleadings was not barred by the law of the case doctrine, which is discretionary . . . and in any event cannot bind an appellate court." *Id*. at 40-41. By the same token, if the district court initially wrote an opinion granting the motion to dismiss, but soon thereafter decided that was an erroneous ruling and directed that the case proceed, after ample discovery, to trial, resulting in the plaintiff's verdict, it appears that the question on appeal would be whether the ultimate ruling was correct, regardless of whether it was a changed ruling.

We recognize that, in a significantly different circumstance, our court has expressed views on the application of the LOTC doctrine which seem, on superficial examination, to be in substantial tension with the views expressed above. In *Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, we observed in dictum that "those decisions [decisions under Rule 54(b)] may not *usually* be changed unless there is 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice.'" 322 F.3d 147, 167

(2d Cir. 2003) (emphasis added) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

The district court in that case had entered a partial judgment dismissing Color Tile Committee's claims against Coopers & Lybrand. *Id.* at 152. Two years later, Color Tile Committee moved under Rule 54(b) for reconsideration of the prior dismissal of those claims. *Id.* at 166-67. The district court denied the motion, without reference to LOTC, on the ground that the motion was "really an untimely motion to amend the pleading . . . ." *Id.* at 156. After the entry of final judgment, Color Tile Committee appealed from the district court's denial of its motion under Rule 54(b). We rejected the claim, noting that a district court's denial of such a motion is reviewed for abuse of discretion, and adding the language quoted above about the limited circumstances in which "those decisions" usually may be revised. *Id.* at 167.

In fact, the observation quoted from *Official Committee* is not in tension with our discussion because it dealt with a substantially different circumstance. Apart from the fact that these remarks in *Official Committee* were dictum and were qualified by the word "usually," unlike our case, they related to the revision of a partial *judgment*. The court's observation was not about *all*

decisions, but about "those decisions," which were identified just above as decisions under Rule 54(b). *Id.* at 167.

A decision under Rule 54(b) is one that adjudicates claims and determines the rights and liabilities of parties. Such a decision is of a different character from other kinds of rulings a court may make. It would serve as an immediately appealable final judgment if no other claims remained to be adjudicated. Even when other claims remain, such a partial adjudication may be entered as an immediately appealable final judgment if the district court "determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).

In the interests of finality in litigation, the governing rules severely restrict circumstances in which courts may revise final judgments. *See* Fed. R. Civ. P. 60(b). To be sure, the revision of partial judgments is not so restricted by the Federal Rules, as Rule 54(b) expressly provides that they "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Nonetheless, the interests of finality can apply in a different way to decisions that adjudicate claims than to other sorts of decisions a court may make. It is inconceivable that the court's statement in *Official Committee* about "those

decisions" was intended to mean that a trial court's "decision" to allow two months to conclude discovery, or to sustain an objection to a question, "may not usually be changed unless there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." *Official Comm.*, 322 F.3d. at 167. The court was referring to a decision that adjudicated a claim.

The initial decision in our case, which the district court later reversed, did not adjudicate a claim or determine the rights and liabilities of the parties. To the contrary, it expressly declined to do so. It was not a decision of the sort covered by Rule 54(b) and thus was not the sort of decision covered by the statement in *Official Committee*.

In any event, even if it were contraindicated under LOTC for a trial court to replace an incorrect ruling with a correct one, the mere fact of the change of ruling would still not justify an appellate court in vacating the judgment. If LOTC were pushed so far as to call upon the reviewing court to vacate a changed, but correct, judgment, solely by reason of the change, LOTC would then mean that the initial incorrect ruling would bind not only the court that made it, but also the court of appellate review, whose function

is to correct errors, rather than perpetuate them. *Christianson v. Colt Indus.* *Operating Corp.*, 486 U.S. 800, 817 (1988) ("Just as a district court's adherence to law of the case cannot insulate an issue from appellate review, a court of appeals' adherence to the law of the case cannot insulate an issue from this Court's review."). We have previously rejected such a proposition. *See Quinn*, 616 F.2d at 40-41.

Accordingly, when an appeal is based on the argument that the district court contravened LOTC by changing the prior ruling, and the appeals court finds no substantive error in the district court's ultimate, changed ruling, it is difficult to see what could justify overturning the judgment, unless either the change caused prejudice to a party that relied detrimentally on the earlier ruling, or perhaps that the change was made in a manner so unseemly as to cast doubt on the propriety of the proceeding. *See Zdanok*, 327 F.2d at 953 (raising issue of "unseemliness" of changing rulings).

b. <u>Application</u>

As noted above, Defendants moved for summary judgment after the close of discovery, on June 5, 2015. After receiving the Magistrate Judge's recommendation to deny the motion, the court entered an order on January

19, 2016 accepting the recommendation, denying summary judgment, and instructing that the case proceed to trial. On August 29, 2016, shortly before trial was to begin, Defendants submitted a trial brief in which they argued again that the court should rule in their favor essentially for the reasons they had argued in their prior, unsuccessful, motion for summary judgment. The court indicated openness to reconsidering and invited Colvin to respond. Colvin submitted briefing in opposition, arguing in part on the merits while also asserting that, under LOTC, the court should not depart from its prior ruling. Colvin made no claim that she would suffer prejudice resulting from a changed ruling and it appears that any such claim would have lacked merit because there is no indication that Colvin relied detrimentally on the court's denial of summary judgment.

Based on the new briefing, the district court decided that summary judgment should be granted on the merits, based on the conclusion that Colvin's efforts on behalf of Buch were not speech on a matter of public concern. The court then faced the question whether Colvin's LOTC argument, unsupported by any claim or showing of prejudice, would justify the court's subjecting itself and the parties to the expense and burden of requiring a trial,

notwithstanding that the trial could serve no useful purpose in view of the fact that the court had concluded that Defendants were entitled to judgment as a matter of law. The court treated the argument made in Defendants' trial brief as a motion to reverse a prior decision made under Rule 54(b) and considered the proposition set forth in *Official Committee of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP* that, under LOTC, a decision usually may not be revised "unless there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." 322 F.3d. at 167 (internal citation omitted). The court concluded that it was reconsidering its prior ruling "in order to correct [a] clear error," and granted summary judgment in favor of Defendants. *Colvin v. Keen*, 13-CV-3595 (SJF)(ARL), 2016 WL 5408117, at *2 (E.D.N.Y. Sept. 28, 2016).

Colvin argues on appeal that, under the doctrine of LOTC, we should vacate the district court's grant of summary judgment and remand the case for trial. Colvin has not cited a single instance, and we know of none, in which our court has vacated a judgment under LOTC for the sole reason that the lower court had changed a ruling, regardless of absence of prejudice

caused by the change. She relies on a proposition, cited in *Zdanok*, that "where litigants have once battled for the court's decision, they should neither be required, nor *without good reason* permitted, to battle for it again." 327 F.2d 944, 953 (emphasis added). The circumstances in *Zdanok*, however, were very different from these. To begin, *Zdanok* did not involve an application to a higher court to overturn a judgment of the lower court on the ground that the lower court had changed a ruling in violation of LOTC. In *Zdanok*, the court of appeals contemplated whether it should reverse its own prior judgment entered by another panel of the same court. *Id*. at 949-50. Where, as here, a higher court is asked to overturn a judgment entered by a lower court, based on the lower court's change of judgment, LOTC applies in a very different way. As it is widely recognized that a court's decision to change its own prior ruling is discretionary, *see, e.g.*, *In re PCH Assocs.*, 949 F.2d at 592 (2d Cir. 1991); *Quinn*, 616 F.2d at 40, we cannot properly overturn the district court's judgment unless we find that its decision to change its ruling was an abuse of discretion. In contrast, when a court, as in *Zdanok*, faces the question whether to depart from its *own* prior ruling, the court has wide discretion to make whichever decision it thinks preferable.

Furthermore, there were circumstances in *Zdanok* that are not present here and that argued strongly against changing the ruling in question. Specifically, *Zdanok* addressed a long, protracted dispute over the transferability of employees' seniority rights upon the employer's transfer of operations at a manufacturing plant. 327 F.2d at 947. In a prior appeal, this Court had ruled on the meaning of the collective bargaining agreement that governed the seniority rights of employees transferring from the old to the new plant. *Zdanok v. Glidden Co.*, 288 F.2d 99 (2d Cir. 1961). The case had subsequently gone to the Supreme Court, which ruled on other matters, and then returned to the district court. *Zdanok v. Glidden Co.*, 216 F. Supp. 476, 477-78 (S.D.N.Y. 1963). The district court had conducted a trial on the issue of liability, based on the contract interpretation mandated by this Court's earlier opinion, granting judgment as to liability against the employer. *Id*. at 483. The judgment as to liability was then appealed to this Court, where the employer asked us to reevaluate the interpretation of the contract established in the prior panel's precedential ruling. The employer argued that a different interpretation was warranted by reason of an intervening Supreme Court opinion to the effect that collective bargaining agreements are interpreted

under federal rather than state law. *Zdanok*, 327 F.2d at 950. We found those arguments unpersuasive in view of the similarity between the state and federal laws in question. *Id*. at 950-51. We nonetheless recognized a possibility that our earlier ruling might have been mistaken. *Id.* at 952. In spite of that possibility, we declined the employer's invitation to re-examine the correctness of the prior ruling in view of the long history of the litigation, which had been conducted in reliance on the rule dictated by the prior ruling. *Id.* at 952-53. We had never concluded that the prior ruling was wrong, only that this was a possibility. Furthermore, overturning that prior ruling after so much litigation had been conducted in reliance on the rule it established would have caused substantial prejudice to the party adversely affected.

The proposition quoted from *Zdanok*, on which Colvin relies, was not expressed as a categorical rule, but only as a "consideration" to be evaluated in the court's exercise of discretion committed to the court's "good sense." *Id*. at 953. In any event, the quoted proposition from *Zdanok,* even if treated as a rule, would not make it reversible error for the district court to have changed its ruling in these circumstances. At most, the *Zdanok* proposition could be read to say that a court should not allow litigants to advocate for a change of

25

ruling "without good reason." *Id*. In this case, the court had good reason. It was persuaded that Defendants were entitled to summary judgment; it would have been inexcusably wasteful and burdensome to all persons involved to require a trial of a foregone conclusion.

The only quibble we have with the district court's decision to change its ruling was with its belief that the change depended on Rule 54(b), implicating the dicta from *Official Committee*. Rule 54(b), as noted above, relates to revising a partial judgment, which is a "decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . ." Fed. R. Civ. P. 54(b). The decision on which Defendants sought a reversal was a *denial* of summary judgment. It did not adjudicate any claim or any rights or liabilities of any parties, but rather declined to adjudicate Colvin's claim. Rule 54(b) and the restrictive language of *Official Committee*, which related to the question whether to reverse a previous *grant* of judgment, have no application here.

We see no reason why there was any impropriety in the district court's exercise of its discretion to revisit its earlier denial of summary judgment, much less any reason to vacate its judgment for the sole reason that it had

reversed its earlier ruling. If the ultimate, changed ruling was correct, and Plaintiff suffered no prejudice from the change, it was altogether appropriate for the court to change its ruling, rather than compel the parties to engage in an unnecessary trial whose result was foreordained. At least in the absence of any prejudice to the parties, it was sufficient for the court to conclude, notwithstanding the prior ruling, that Defendants were entitled to summary judgment. The district court acted well within its discretion to reconsider and reverse its prior ruling, by which it avoided burdening itself and the parties with an unnecessary trial.

## II.    *Speech on a Matter of Public Concern and Qualified Immunity*

Colvin also contends that, on the merits, her speech was protected by the First Amendment. The First Amendment protects a public employee from retaliation by her government employer for speech made "as a citizen on a matter of public concern," *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006), so long as "the interests of the [speaker], as a citizen, in commenting upon matters of public concern" are not outweighed by "the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its employees," *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 568 (1968).

We need not decide whether Colvin's speech qualified as addressing a matter of public concern because Defendants were protected from both liability and the obligation to defend the case because of qualified immunity. [4] Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" if "it would be clear to a reasonable [person in the position of the defendant] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (internal quotation marks omitted). The Defendants were entitled

---

[4] Defendants, in addition to moving for summary judgment on the merits, had also moved for judgment on the basis of their entitlement to qualified immunity.

to summary judgment unless there was clearly established law to the effect that Colvin's speech was on a matter of public concern.

There is no clearly established law to that effect. The speech of a public employee is addressed to a matter of public concern where it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). To qualify, the speech must have "a broader public purpose" and not be merely "calculated to redress personal grievances." *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008) (internal quotations omitted). In determining whether speech addresses a matter of public concern, we examine the "content, form, and context of a given statement." *Reuland v. Hynes*, 460 F.3d 409, 416 (2d Cir. 2006) (quoting *Connick*, 461 U.S. at 147-48).

The precedents do not show a "clearly established" law favoring Colvin on this question. This court has found, on the one hand, that speech debating issues of discrimination, speech seeking relief from "pervasive or systemic misconduct" by public officials, and speech that is "part of an overall effort to correct allegedly unlawful practices or bring them to public attention" all go to matters of public concern. *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir.

2014). By contrast, we have found speech that "concerns essentially personal grievances" does not qualify as speech on a matter of public concern, *Ruotolo*, 514 F.3d at 190. We have also reasoned that speech is not on a matter of public concern where it has "no practical significance to the general public," *Nagle v. Marron*, 663 F.3d 100, 107 (2d Cir. 2011). Examples include speech alleging that a public school employee forged a signature on a teaching observation, *id.*, survey questions about coworkers' office morale, *see Connick*, 461 U.S. at 148, speech concerning the speaker's own work assignments or salary, *see Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991), and speech accusing a supervisor of favoritism, *see Singer v. Ferro*, 711 F.3d. 334, 340 (2d Cir. 2013).

It is true that, under certain circumstances, we have found speech to be on a matter of public concern where it sought to "vindicate . . . constitutional rights . . . in the face of alleged police misconduct." *Golodner*, 770 F.3d at 204. In *Golodner*, we reasoned that "it is axiomatic that misconduct within a police department implicates a matter of public concern." *Id.* In that case, however, the speech at issue related to alleged policies and patterns of police misconduct that "raise[d] serious constitutional concerns." *See id.* at 205.

Colvin's speech, by contrast, was not addressed to misconduct at all. Colvin merely identified herself as an attorney, told her co-worker and the police officers that she wanted to get her co-worker an attorney and union representative, and advised her friend not to say anything until such representatives arrived. Colvin said nothing to indicate that Ms. Buch's arrest was constitutionally improper.[5] Since her speech was not addressed to police misconduct at all, much less to the sort of pattern of misconduct alleged in *Golodner*, *Golodner* does not clearly establish that Colvin's speech was on a matter of public concern.

Nor does *Konits v. Valley Stream Cent. High Sch. Dist.* clearly establish that Colvin's speech was on a matter of public concern.  In that case, we held that a teacher's efforts to assist a custodial worker in redressing claims of gender discrimination constituted speech on a matter of public concern where the teacher (1) helped her file internal complaints; (2) referred her to an attorney who represented her in subsequent proceedings; and (3) agreed to be listed as a potential witness in those proceedings. 394 F.3d 121, 123-26 (2d Cir. 2005). We emphasized that the teacher was speaking out "against

---

[5] We recognize that Colvin stated, in response to the police threatening to arrest her as well, "I believe that would be a false arrest." App'x 215. However, Colvin has never alleged that she faced retaliation for that speech. In fact, she does not address that speech at all on her appeal to this Court.

31

discrimination suffered by others." *Id.* at 125. Colvin, by contrast, was advising a co-worker of her constitutional rights, not speaking out against any perceived discrimination or official misconduct. *Konits*, like *Golodner*, does not clearly establish that Colvin's speech was on a matter of public concern.

Colvin urges us to find that communicating "advice that is consistent with *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)] by a bystander to a person being arrested, made in the presence of the arresting police, *per se* addresses a matter of public concern." Plaintiff-Appellant Br. at 28. Our precedents do not clearly establish such a rule. Although we have found that speech addressed to police misconduct and discrimination against others may, under some circumstances, constitute speech on a matter of public concern, there is no clearly established law that merely advising another of a constitutional right necessarily constitutes speech on a matter of public concern. Because it was not "clearly established" that Colvin's speech addressed a matter of public concern, *see Pearson*, 555 U.S. at 231, Defendants are entitled to qualified immunity.

**CONCLUSION**

We find that Defendants are entitled to qualified immunity, and accordingly AFFIRM the district court's grant of summary judgment on that basis.